1  Robert C. Moest, Of Counsel, SBN 62166
   **THE BROWN LAW FIRM, P.C.**
2  2530 Wilshire Boulevard, Second Floor
   Santa Monica, California 90403
3  Telephone: (310) 915-6628
   Facsimile: (310) 915-9897
4  Email: RMoest@aol.com

5  *Counsel for Plaintiff*

6

7  **IN THE UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF CALIFORNIA**

8
   NARESH SURI, derivatively on behalf of
9  GINKGO BIOWORKS HOLDINGS, INC. f/k/a
   SOARING EAGLE ACQUISITION CORP.,
10                                              Case No.:
        Plaintiff,
11
12      v.                                      DEMAND FOR JURY TRIAL

13 JASON KELLY, MARK DMYTRUK, HARRY
   E. SLOAN, RESHMA SHETTY, ARIE
14 BELLDEGRUN, MARIJN DEKKERS,
   CHRISTIAN HENRY, SHYAM SANKAR, ELI
15 BAKER, SCOTT M. DELMAN, JOSHUA
   KAZAM, ISAAC LEE, TIMOTHY LEIWEKE,
16 DENNIS A. MILLER, and LAURENCE E.
   PAUL,
17
        Defendants,
18
        and
19
20 GINKGO BIOWORKS HOLDINGS, INC. f/k/a
   SOARING EAGLE ACQUISITION CORP.,
21
        Nominal Defendant.
22

23

24            **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

25

26

27

28

## INTRODUCTION

Plaintiff Naresh Suri ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Ginkgo Bioworks Holdings, Inc. ("New Ginkgo" or the "Company") f/k/a Soaring Eagle Acquisition Corp. ("SRNG" or the "Company"),[1] files this Verified Shareholder Derivative Complaint ("Complaint") against Individual Defendants Jason Kelly ("Kelly"), Reshma Shetty ("Shetty"), Mark Dmytruk ("Dmytruk"), Marijn Dekkers ("Dekkers"), Christian Henry ("Henry"), Shyam Sankar ("Sankar") (collectively, the "Legacy Ginkgo Defendants"); Harry E. Sloan ("Sloan"), Eli Baker ("Baker"), Scott M. Delman ("Delman"), Joshua Kazam ("Kazam"), Isaac Lee ("Lee"), Timothy Leiweke ("Leiweke"), Dennis A. Miller ("Miller"), Laurence E. Paul ("Paul") (collectively, the "SRNG Defendants"); and Arie Belldegrun ("Belldegrun") (the Legacy Ginkgo Defendants, the SRNG Defendants, and Defendant Belldegrun, collectively, the "Individual Defendants" and with the Company, the "Defendants"), for breaches of their fiduciary duties as directors and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, and waste of corporate assets; against Defendants Sloan, Delman, Kazam, Lee, Leiweke, Miller, and Paul for violations of Section 14(a) of the Exchange Act; against Defendants Kelly, Dmytruk, and Sloan for contribution under Sections 10(b) and 21D of the Exchange Act; and against the Legacy Ginkgo Defendants and Defendant Belldegrun for aiding and abetting certain breaches of fiduciary duty by the SRNG Defendants. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company and Legacy Ginkgo (defined below), legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a

---

[1] "New Ginkgo" refers to the "Company" after the Merger (defined below) and name change, whereas "SRNG" refers to the "Company" prior to the Merger and name change.

reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This shareholder derivative action seeks to remedy wrongdoing committed by the controlling shareholders, directors, and officers of the Company from May 11, 2021 through October 5, 2021 (the "Relevant Period").

2.     New Ginkgo is a biotechnology company incorporated in Delaware with its headquarters in Boston, Massachusetts. The Company's business involves cell programming. Specifically, the Company purports to use cell programming to assist customers in overhauling manufacturing processes or developing new products. The Company's functional predecessor Ginkgo Bioworks, Inc. ("Legacy Ginkgo") was founded in 2008 by, among others, Defendants Kelly and Shetty.

3.     The Company divides its platform into two "core assets." The first of these is the "Foundry," which uses software, machines, and automation to manipulate deoxyribonucleic acid ("DNA"), including by designing DNA, writing DNA, inserting DNA into cells, and using data analysis to improve the process. The second "core asset" is the Company's "Codebase," which is the Company's repository for information gained from its efforts in the Foundry. The Company uses its Codebase to enhance future efforts in the Foundry.

4.     SRNG was a special purpose acquisition company ("SPAC"), also known as a blank check company, created for the purpose of raising capital through an initial public offering and using the capital infusion to acquire an existing company. SRNG completed its initial public offering on February 26, 2021 (the "IPO"), generating gross proceeds of $1,725,000,000. Simultaneously with the consummation of the IPO, the Company completed the private sale of 19,250,000 warrants to Eagle Equity Partners III, LLC ("Sponsor") at a purchase price of $1.50 per warrant, generating gross proceeds of $28,875,000.

5.     On May 11, 2021, SRNG and Legacy Ginkgo announced that they had entered into an agreement to merge, whereby Legacy Ginkgo would merge with a subsidiary of SRNG called SEAC Merger Sub Inc. ("Merger Sub")—becoming SRNG's wholly-owned subsidiary—and SRNG would rename itself Ginkgo Bioworks Holdings, Inc. On September 16, 2021, SRNG, Merger Sub, and Legacy Ginkgo consummated the anticipated business combination (the "Merger"). The term "Ginkgo," when

used alone in this Complaint, refers to the business of Legacy Ginkgo prior to the Merger and the continuation thereof as part of the Company following the consummation of the Merger.

6.      During the Relevant Period, the Individual Defendants made and/or caused the Company to make materially false and misleading statements concerning the business, operations, and prospects of Ginkgo. Specifically, the Individual Defendants touted Ginkgo's Foundry revenue and new partnership agreements.

7.      However, during this time, the Individual Defendants failed to disclose the full extent to which Ginkgo was reliant on revenue from related parties, and further failed to disclose that Ginkgo was misclassifying and underreporting related-party revenue to conceal its profound dependence on related parties (the "Misclassification Misconduct").

8.      The Individual Defendants' misrepresentations and the Misclassification Misconduct had the effect of misleading the investing public and artificially inflating the Company's stock during the Relevant Period.

9.      The truth emerged on October 6, 2021, when Scorpion Capital ("Scorpion") published a report (the "Report") describing the Misclassification Misconduct. The Report described Ginkgo as a "colossal scam" and a "shell game" that is highly dependent on related-party transactions. The Report alleged that Ginkgo was "concealing the true extent of its dependence on related party revenue" and that Ginkgo was "misclassifying and underreporting related party revenue." Among other allegations, the Report contended that Ginkgo was "round-tripping" revenue by making equity investments in related-party customers that the purported customers then returned via "low-value, sham projects," amounting to circular revenue flows.

10.     On this news, the price per share of the Company's common stock fell $1.39, or approximately 11.6%, to close at $10.59 on October 6, 2021.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements about Ginkgo. Specifically, they willfully or recklessly made and/or caused the Company to make to the investing public certain false and misleading statements that failed to disclose, *inter alia*, that:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(1) Ginkgo was engaging in the Misclassification Misconduct; (2) Ginkgo's failure to derive revenue from third parties left it almost fully dependent on related parties; (3) most or all of Ginkgo's revenue came from related parties that it created, funded, or controlled; (4) many of Ginkgo's new partners were undisclosed related parties; (5) as a result of the foregoing, the valuation of Ginkgo had been misrepresented to investors; and (6) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     In further breach of their fiduciary duties to the Company, the Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact.

13.     The SRNG Defendants breached their fiduciary duties to SRNG by causing it to acquire Legacy Ginkgo on terms that were unfavorable to SRNG shareholders in light of the Misclassification Misconduct, which was then undisclosed (the "Overpayment Misconduct").

14.     The Legacy Ginkgo Defendants aided and abetted the breaches of fiduciary duty by the SRNG Defendants due to their role in effecting the Merger, issuing false and misleading statements, and causing Legacy Ginkgo to engage in the Misclassification Misconduct.

15.     Also during the Relevant Period, Defendants Kelly, Shetty, Dmytruk, Belldegrun, Dekkers, Henry, Sankar, and Sloan (the "New Ginkgo Defendants") breached their fiduciary duties by causing the Company to continue to engage in the Misclassification Misconduct.

16.     The Individual Defendants further breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

17.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its Chief Financial Officer ("CFO"), and its former CEO (now a non-employee director), to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and an inquiry from the Department of Justice ("DOJ"), and which has further subjected the Company to the need to undertake intake internal investigations, the need to implement adequate internal controls, losses from the waste of

corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

18. In light of the breaches of fiduciary duty by the Individual Defendants, a majority of whom constitute the Company's Board of Directors (the "Board"), their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and former CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, the Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on the Company's behalf with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

20. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

21. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

22. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

23. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District. Moreover, the Company maintains an office in this District.

## PARTIES

Verified Shareholder Derivative Complaint

**Plaintiff**

24.     Plaintiff is a current shareholder of the Company's common stock. Plaintiff has continuously held Company common stock at all relevant times.

**Nominal Defendant New Ginkgo**

25.     New Ginkgo a/k/a Ginkgo Bioworks Holdings, Inc. is a Delaware corporation with its principal executive offices at 27 Drydock Avenue, 8th Floor, Boston MA 02210. The Company also maintains an office in Emeryville, California. The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DNA." Its warrants to purchase one share of Class A common stock also trade on the NYSE, under the ticker symbol "DNA.WS."

26.     The Company maintains a multi-class stock structure. Shares of the Company's Class A common stock have one vote per share; shares of the Company's Class B common stock have ten votes per share; and shares of the Company's Class C common stock have no voting rights under most circumstances. Each share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock. In addition, shares of Class B common stock generally convert automatically into Class A common stock upon the holder of such shares ceasing to be a Company director or employee.

**Defendant Kelly**

27.     Defendant Kelly cofounded Legacy Ginkgo. He served as CEO and as a director of Legacy Ginkgo from its founding in 2008 until the Merger, when he continued serving in those roles at the Company. According to the Company's annual report filed on Form 10-K with the SEC on March 28, 2022 (the "2021 10-K"), as of March 17, 2022,[2] Defendant Kelly beneficially owned 82,431,106 shares of the Company's Class B common stock, representing 16.5% of the total voting power of the Company. Together with his positions at the Company, this makes him a controlling shareholder. Given that shares of Class B are convertible at any time into shares of Class A common stock and the price per share of the

---

[2] The 2021 10-K's table setting forth beneficial ownership calculations states that the calculations are based on the number of shares outstanding calculated as of March 17, 2022. The allegations concerning beneficial ownership contained in this Verified Shareholder Derivative Complaint assume that the 2021 10-K's statements concerning the precise holdings of each Individual Defendant were also calculated as of the date of March 17, 2022, a detail which is not specified in the 2021 10-K.

Company's Class A common stock at the close of trading on March 17, 2022 was $2.97, Defendant Kelly beneficially owned approximately $244.8 million worth of Company stock.

28.    For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Kelly received $364,186,973 in compensation from the Company, consisting of $250,000 in salary, $363,924,473[3] in stock awards, and $12,500 in all other compensation.

29.    The 2021 10-K stated the following about Defendant Kelly:

*Jason Kelly*, one of our Founders, is the Chief Executive Officer and a member of Ginkgo's board of directors. Dr. Kelly has served as a director of CM Life Sciences II Inc. (Nasdaq: CMII), a SPAC with a focus on the life sciences sector, since its IPO in February 2021. Dr. Kelly has a Ph.D. in Biological Engineering and a B.S. in Chemical Engineering and Biology from the Massachusetts Institute of Technology. We believe that Dr. Kelly is qualified to serve on our board of directors as a Founder and due to his knowledge of our company and our business.

### Defendant Dmytruk

30.    Defendant Dmytruk served as Legacy Ginkgo's CFO from November 9, 2020 until the Merger, when he began serving as the Company's CFO. According to the 2021 10-K, as of March 17, 2022, Defendant Dmytruk beneficially owned 674,494 shares of the Company's Class B common stock. Given that shares of Class B are convertible at any time into shares of Class A common stock and the price per share of the Company's Class A common stock at the close of trading on March 17, 2022 was $2.97, Defendant Dmytruk beneficially owned approximately $2.0 million worth of Company stock.

31.    For the 2021 Fiscal Year, Defendant Dmytruk received $40,068,678 in compensation from the Company, including $425,000 in salary, $39,629,178[4] in stock awards, and $14,500 in all other compensation.

32.    The 2021 10-K stated the following about Defendant Dmytruk:

*Mark Dmytruk* has served as our Chief Financial Officer since joining Ginkgo in 2020. From 2017 to 2020, Mr. Dmytruk served as Executive Vice President, Corporate Strategy and Development, for Syneos Health, a global Contract Research Organization and

---

[3] According to the Proxy Statement, this amount reflects the full grant-date fair value of restricted stock units granted during 2021 computed in accordance with ASC Topic 718, rather than the amounts paid to or realized by Defendant Kelly.

[4] According to the Proxy Statement, this amount reflects the full grant-date fair value of restricted stock units granted during 2021 computed in accordance with ASC Topic 718, rather than the amounts paid to or realized by Defendant Dmytruk.

Verified Shareholder Derivative Complaint

Contract Commercial Organization serving the biopharmaceutical industry. Syneos Health was formed through the merger of inVentiv Health and INC Research in 2017, and prior to the merger Mr. Dmytruk served at inVentiv Health as Chief of Staff from 2014 to 2017 and President, Patient Outcomes Division, from 2011 to 2014. Prior to inVentiv Health, Mr. Dmytruk served in a variety of roles at Thermo Fisher Scientific (and its predecessor, Fisher Scientific) from 2001 to 2011. As Vice President of Corporate Development, Mr. Dmytruk led the company's M&A function, contributing to its industry-changing strategy and transformational growth. He also served as Vice President of Finance for the Athena Diagnostics business unit of Thermo Fisher Scientific prior to its sale to Quest Diagnostics. Mr. Dmytruk began his career at Ernst & Young in Canada. Mr. Dmytruk has an M.B.A. from the Sloan School of Management at the Massachusetts Institute of Technology and a Bachelor of Commerce from the University of Alberta.

**Defendant Sloan**

33.     Defendant Sloan served as CEO and Chairman of SRNG from October 2020 until the Merger, when he became a director of the Company. He currently serves as a member of the Audit Committee. Defendant Sloan is one of three managing members of Sponsor which, according to the Company's prospectus filed on December 10, 2021 with the SEC (the "December 10, 2021 Prospectus"), beneficially owned 48.9 million shares of the Company's Class A common stock as of November 8, 2021. Given that the price per share of the Company's Class A common stock at the close of trading on November 8, 2021 was $14.92, Sponsor owned approximately $730 million of Company common stock as of November 8, 2021.[5]

34.     For the 2021 Fiscal Year, Defendant Sloan received $17,283 in compensation from the Company, consisting of $17,283 in fees earned or paid in cash. According to the December 10, 2021 Prospectus, Defendant Sloan is eligible to receive annual fees of $50,000 for service as a director and $10,000 for service as a member of the Audit Committee, in addition to certain restricted stock units and options to purchase shares of common stock.

35.     The 2021 10-K stated the following Defendant Sloan:

***Harry E. Sloan*** is a founder, public company CEO and a leading investor in the media, entertainment and technology industries. Mr. Sloan is the Chairman and CEO of Eagle Equity Partners II, LLC. Under Mr. Sloan's leadership, the company has acquired and taken public, through SPACs, several digital media companies including, during 2020, DraftKings and mobile gaming company Skillz. Mr. Sloan has been at the forefront and evolution of the video gaming industry as one of the founding investors and a Board

---

[5] The table in the 2021 10-K disclosing the beneficial ownership of New Ginkgo as of March 17, 2022 does not disclose Sponsor's holdings as of that date.

Member of Zenimax/Bethesda Game Studios, the awarding winning studio acquired by Microsoft in March 2021. After delivering two of the most successful SPAC business combinations to date, Mr. Sloan co-founded Soaring Eagle Acquisition Corp. (Nasdaq: SRNGU), which raised $1.725 billion in its IPO in February 2021 and three months later announced a merger with Boston-based Ginkgo Bioworks Inc. in a deal valued at $17.5 billion. In January 2022, Mr. Sloan and his partners launched Screaming Eagle Acquisition Corp. With a closing of its initial public offering of 75,000,000 units, at a price of $10 per unit, Screaming Eagle is the largest IPO of a public acquisition vehicle since March 2021. Mr. Sloan has served as a director of Skillz, Inc. since December 2020 and DraftKings Inc. since April 2020. He was a director of Soaring Eagle Acquisition Corp. from October 2020 until September 2021, Flying Eagle Acquisition Corp. from March 2020 until December 2020, Diamond Eagle Acquisition Corp. from May 2019 until April 2020, and Videocon d2h Limited from May 2016 until April 2018. We believe that Mr. Sloan is qualified to serve on our board of directors due to his public company experience, business leadership, and operational experience.

**Defendant Shetty**

36.     Defendant Shetty cofounded Legacy Ginkgo. She served as President, Chief Operating Officer ("COO") and as a director of Legacy Ginkgo from its founding in 2008 until the Merger, after which she continued serving in those roles at the Company. According to the 2021 10-K, as of March 17, 2022, Defendant Shetty beneficially owned 165,841,730 shares of the Company's Class B common stock, representing 33.2% of the total voting power of the Company. Together with her positions at the Company, this makes her a controlling shareholder. Given that shares of Class B are convertible at any time into shares of Class A common stock and the price per share of the Company's Class A common stock at the close of trading on March 17, 2022 was $2.97, Defendant Shetty beneficially owned approximately $492.5 million worth of Company stock.

37.     For the 2021 Fiscal Year, Defendant Shetty received $364,186,973 in compensation from the Company, which consisted of $250,000 in salary, $363,924,473[6] in stock awards, and $12,500 in all other compensation.

38.     The 2021 10-K stated the following about Defendant Shetty:

*Reshma Shetty*, one of our Founders, is the President and Chief Operating Officer and a member of Ginkgo's board of directors. Dr. Shetty currently serves on the Bio Advisory Group at the non-profit Nuclear Threat Initiative. Dr. Shetty has a Ph.D. in Biological Engineering from the Massachusetts Institute of Technology and a B.S. in Computer

---

[6] According to the Proxy Statement., this amount reflects the full grant-date fair value of restricted stock units granted during 2021 computed in accordance with ASC Topic 718, rather than the amounts paid to or realized by Defendant Shetty.

Science from the University of Utah. We believe that Dr. Shetty is qualified to serve on our board of directors as a Founder and due to her knowledge of our company and our business.

**Defendant Belldegrun**

39.     Defendant Belldegrun has served as a Company director since the Merger. He currently serves as a member of the Compensation Committee. According to the Company's Form 424B3 filed with the SEC on August 13, 2021, which formed a part of the Registration Statement and which also constituted a proxy statement of SRNG under Section 14(a) of the Exchange Act (the "Proxy Statement"), Defendant Belldegrun served as an advisor to the SRNG Defendants in negotiations, investigation, and due diligence into Legacy Ginkgo prior to the consummation of the Merger. Specifically, the Proxy Statement states that Defendant Kazam has a "track record and partnership" with Defendant Belldegrun, and Defendant Belldegrun attended a number of meetings with Legacy Ginkgo and inspected Legacy Ginkgo's headquarters and Foundry in Boston. He also engaged in discussions with Defendants Kelly and Sloan regarding Legacy Ginkgo's potential.

40.     For the 2021 Fiscal Year, Defendant Belldegrun received $16,563 in compensation from the Company, consisting of fees earned or paid in cash. According to the December 10, 2021 Prospectus, Defendant Belldegrun is eligible to receive an annual director fee of $50,000 for his service on the Board, as well as an annual fee of $7,500 for his service on the Compensation Committee, in addition to certain restricted stock units and options to purchase shares of common stock.

41.     The 2021 10-K stated the following about Defendant Belldegrun:

*Arie Belldegrun, M.D.*, is a member of Ginkgo's board of directors. Dr. Belldegrun is a leader in the field of cell and gene therapy. Dr. Belldegrun is a co-founder of Allogene Therapeutics, a public biopharmaceutical company, and has served as Executive Chairman of its board of directors since November 2017. From March 2014 until October 2017, Dr. Belldegrun served as the President and Chief Executive Officer of Kite Pharma, Inc. and as a member of its board of directors from June 2009 until October 2017. Dr. Belldegrun currently serves as Chairman of Bellco Capital LLC, a position he has held since 2004, Chairman of Kronos Bio, a position he has held since November 2017, Chairman of UroGen Pharma, Ltd., a position he has held since December 2012, as Chairman and Partner of Two River Group, a position he has held since June 2009, as co-Chairman of Breakthrough Properties LLC and Breakthrough Services, L.L.C., a position he has held since April 2019, as a director of ByHeart, Inc., a position he has held since October 2019, and as a director of IconOVir Bio, Inc., a position he has held since June 2020. Dr. Belldegrun has also served as Senior Managing Director of Vida Ventures, LLC since November 2017. He is certified by the American Board of Urology and the American

Association of Genitourinary Surgeons. Dr. Belldegrun is Research Professor, holds the Roy and Carol Doumani Chair in Urologic Oncology, and Director of the Institute of Urologic Oncology at the David Geffen School of Medicine at the University of California, Los Angeles. Prior to joining UCLA in October of 1988, he was a research fellow at NCI/NIH in surgical oncology and immunotherapy from July 1985 to August 1988 under Dr. Steven Rosenberg. Dr. Belldegrun received his M.D. from the Hebrew University Hadassah Medical School in Jerusalem before completing his post graduate studies in Immunology at the Weizmann Institute of Science and his residency in Urologic Surgery at Harvard Medical School. We believe that Dr. Belldegrun is qualified to serve on our board of directors due to his extensive knowledge as a leader in the field of cell and gene therapy.

**Defendant Dekkers**

42.     Defendant Dekkers served as chairman of the board of directors of Legacy Ginkgo from April 2019 until the Merger, after which he continued serving in that position at the Company. In addition, Defendant Dekkers currently serves as Chair of the Nominating and Corporate Governance Committee. According to the 2021 10-K, as of March 17, 2022, Defendant Dekkers beneficially owned 7,902,030 shares of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 17, 2022 was $2.97, Defendant Dekkers owned approximately $23.5 million worth of Company stock.

43.     For the 2021 Fiscal Year, Defendant Dekkers received $30,460,623 in compensation from the Company, consisting of $30,533 in fees earned or paid in cash and $30,430,090[7] in stock awards.

44.     The 2021 10-K stated the following about Defendant Dekkers:

*Marijn Dekkers* is chairman of Ginkgo's board of directors. Dr. Dekkers is the Founder and Chairman of Novalis LifeSciences LLC, an investment and advisory firm for the Life Science industry that he founded in 2017. Before that, from 2010 to 2016, Dr. Dekkers served as Chief Executive Officer of Bayer AG. Prior to his time at Bayer, from 2002 to 2009, he served as Chief Executive Officer of Thermo Fisher Scientific. Dr. Dekkers currently serves as a director on the boards of Quantum-SI, Inc. and Cerevel Therapeutics Holdings, Inc., as well as Georgetown University and the Foundation for the National Institutes of Health. He is a former director of Unilever, General Electric and Biogen. Dr. Dekkers began his career in 1985 as a research scientist at General Electric's Corporate R&D Center. Dr. Dekkers received his PhD and M.S. in chemical engineering from the University of Eindhoven and his B.S in chemistry from the Radboud University. We believe that Dr. Dekkers is qualified to serve on our board of directors due to his extensive knowledge of the life sciences industry, his familiarity with our company and his prior director service.

---

[7] This amount reflects the incremental fair value attributable to the modification of equity awards during 2021.

**Defendant Henry**

45.      Defendant Henry served as a director of Legacy Ginkgo from November 2016 until the Merger, when he joined the Company's Board. He currently serves as Chair of the Audit Committee and as a member of the Compensation Committee. According to the 2021 10-K, as of March 17, 2022, Defendant Henry beneficially owned 1,305,943 of the Company's Class A common stock. Given that the price per share of the Company's Class A common stock at the close of trading on March 17, 2022 was $2.97, Defendant Henry owned approximately $3.9 million worth of Company stock.

46.      For the 2021 Fiscal Year, Defendant Henry received $20,022,517 in compensation from the Company, consisting of $22,323 in fees earned or paid in cash and $20,000,194[8] in stock awards.

47.      The 2021 10-K stated the following about Defendant Henry:

*Christian Henry* is a member of Ginkgo's board of directors. Mr. Henry has served as President and Chief Executive Officer of Pacific Biosciences of California, Inc., a leading sequencing company, since September 2020. From 2005 to January 2017, Mr. Henry was a member of the executive team of Illumina, Inc., a global leader in sequencing. During this tenure at Illumina, he served in a number of roles, including Executive Vice President & Chief Commercial Officer, Senior Vice President of Genomic Solutions, Senior Vice President and General Manager of Life Sciences and Senior Vice President and Chief Financial Officer. Prior to joining Illumina in 2005, Mr. Henry served as the Chief Financial Officer of Tickets.com, Inc. from 2003 to 2005. From 1999 to 2003, Mr. Henry served as Vice President, Finance and Corporate Controller of Affymetrix, Inc. (acquired by Thermo Fisher Scientific in 2016). In 1997, Mr. Henry joined Nektar Therapeutics (formerly Inhale Therapeutic Systems, Inc.) as Corporate Controller, and later as its Chief Accounting Officer from 1997 to 1999. In 1996, Mr. Henry served as General Accounting Manager of Sugen, Inc. Mr. Henry began his career in 1992 at Ernst & Young LLP, where he was a Senior Accountant through 1996. Mr. Henry currently serves as a director and Chairman of the board of WAVE Life Sciences Ltd., and as a director of CM Life Sciences Holdings III LLC. Mr. Henry previously served as Chairman of the board of Pacific Biosciences from August 2018 to September 2020. Mr. Henry holds a B.A. in biochemistry and cell biology from the University of California, San Diego and an M.B.A., with a concentration in finance, from the University of California, Irvine. We believe that Mr. Henry is qualified to serve on our board of directors due to his over 20 years of experience in growing companies in the life sciences industry.

**Defendant Sankar**

48.      Defendant Sankar is a Company director, and he also served as a director of Legacy Ginkgo from December 2015 until the Merger. Defendant Sankar currently serves as Chair of the Compensation

---

[8] This amount reflects the incremental fair value attributable to the modification of equity awards during 2021.

Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2021 10-K, as of March 17, 2022, Defendant Sankar beneficially owned 1,260,953 shares of the Company's Class A common stock. Given that the price per share of the Company's common stock at the close of trading on March 17, 2022 was $2.97, Defendant Sankar owned approximately $3.7 million worth of Company stock.

49.     For the 2021 Fiscal Year, Defendant Sankar received $20,645,995 in compensation from the Company, consisting of $20,163 in fees earned or paid in cash and $20,625,832[9] in stock awards.

50.     The 2021 10-K stated the following about Defendant Sankar:

**Shyam Sankar** is a member of Ginkgo's board of directors. Mr. Sankar is the Chief Operating Officer and Executive Vice President at Palantir Technologies Inc., where he has worked in various positions since 2006. Prior to his time at Palantir, Mr. Sankar served as the Vice President of Network Management and Director of Business Development for Xoom Corporation. Mr. Sankar has a deep operational background overseeing the development of complex technology from near inception to massive scale. Mr. Sankar received his M.S. in management science and engineering from Stanford University and his B.S. in electrical and computer engineering from Cornell University. We believe that Mr. Sankar is qualified to serve on our board of directors due to his business acumen, leadership experience, and operational background, having overseen the development and expansion of a software company from its near inception through its public listing.

**Defendant Baker**

51.     Defendant Baker served as SRNG's President and CFO from October 2020 until the Merger. Defendant Baker is one of three managing members of Sponsor which, according to the December 10, 2021 Prospectus, beneficially owned 48.9 million shares of the Company's Class A common stock as of November 8, 2021, valued at approximately $730 million at that time.[10]

52.     The Proxy Statement stated the following about Defendant Baker:

**Eli Baker** has been SRNG's President and Chief Financial Officer since October 2020. Mr. Baker is a Partner in Eagle Equity Partners (and its related companies). Most recently Mr. Baker served as President and Chief Financial Officer of Flying Eagle through the consummation of its business combination with Skillz, Inc. in December 2020. Mr. Baker also served as president, chief financial officer and secretary of Diamond Eagle from March 2019 until the consummation of its business combination with DraftKings, Inc., in

---

[9] This amount reflects the incremental fair value attributable to the modification of equity awards during 2021

[10] The table in the 2021 10-K disclosing the beneficial ownership of New Ginkgo as of March 17, 2022 does not disclose Sponsor's holdings as of that date.

April 2020. Mr. Baker served as the president, chief financial officer and secretary of Platinum Eagle from July 2017 until the consummation of its business combination with Target Hospitality in March 2019, and remains a member of Target Hospitality's board of directors. Mr. Baker served as Double Eagle's vice president, general counsel and secretary from June 2015 through its business combination in November 2017. Mr. Baker was also a director of Silver Eagle from July 2014 through Silver' Eagle's business combination in March 2015. Since June 2016, Mr. Baker has served as a co-founder and partner of Manifest Investment Partners, LLC, a growth equity/venture fund that focuses in early stage technology-enabled business. Mr. Baker continues to be co-managing director and a partner in Hemisphere Capital Management LLC, a private finance company that specializes in special opportunity equity and credit investments in the media and entertainment industry. Mr. Baker is a former lawyer and earned his B.A. degree from the University of California, Berkeley and his J.D. degree from the University of California at Hastings Law School.

**Defendant Delman**

53.     Defendant Delman served as a director of SRNG from its IPO until the Merger.

54.     The Proxy Statement stated the following about Defendant Delman:

***Scott M. Delman*** has served on the SRNG Board since the completion of its initial public offering. Mr. Delman served on Flying Eagle's board of directors from March 2020 through the consummation of its business combination with Skillz, Inc. in December 2020. Mr. Delman also served on Diamond Eagle's board of directors from December 2019 until the consummation of its business combination with DraftKings, Inc., in April 2020. Mr. Delman is the founder of Blue Spruce Productions, a producer of top Broadway and West End theatrical events, and is also the Managing Partner of DGZ Capital, a private equity firm that acquires ownership stakes in alternative investment firms. Prior to forming DGZ Capital, Mr. Delman was co-founder and President of Capital Z Investments, where he initiated and managed a multi-billion-dollar investment program to sponsor the creation of new alternative asset management companies. Capital Z Investments has invested over $2.0 billion in more than 25 investment firms throughout North America, Europe and Asia. Mr. Delman has served on the boards and advisory councils of various academic, corporate, cultural and public policy organizations such as Third Way, the New America Foundation, The Truman Project, Manhattan Theatre Club, Yale Drama School and the Williamstown Theatre Festival. Mr. Delman graduated with honors from Yale College in 1982 and received his M.B.A. degree from Harvard Business School in 1986. Mr. Delman also served as a Visiting Senior Fellow at Harvard University's JFK School for Government in 2006 and 2007, where he focused on the intersection between international capital markets and national security.

**Defendant Kazam**

55.     Defendant Kazam served as a director of SRNG from its IPO until the Merger. The Proxy Statement states that Defendant Kazam has a "track record and partnership" with Defendant Belldegrun, and the two worked together in leading SRNG to merge with Legacy Ginkgo.

---

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

56.     The Proxy Statement stated the following about Defendant Kazam:

***Joshua Kazam*** has served on the SRNG Board since the completion of its initial public offering. Mr. Kazam served on Flying Eagle's board of directors from March 2020 through the consummation of its business combination with Skillz, Inc. in December 2020. Mr Kazam also served on Diamond Eagle's board of directors from May 2019 until the consummation of its business combination with DraftKings, Inc., in April 2020. Mr. Kazam served as a director of Platinum Eagle from its initial public offering through the completion of its initial business combination in March 2019. Mr. Kazam is a co-founder and has been a Partner of Two River Consulting, LLC ("Two River") since fall of 2004. Mr. Kazam is also a co-founder, officer and director of Allogene Therapeutics, Inc. (Nasdaq: ALLO), of Kronos Bio Inc. (Nasdaq: KRON), and TS Innovation Acquisitions and a co-founder of Vida Ventures. Mr. Kazam co-founded and served on the Board of Directors of Kite Pharma, Inc. from its inception in 2009 until it was acquired by Gilead Sciences Inc. (Nasdaq: GILD) in October 2017. Mr. Kazam also serves as a director of several privately held companies, including Iconovir Bio, Hubble Contacts, Byheart, Inc. and Breakthrough Properties, LLC. Mr. Kazam is a Member of the Wharton School's Undergraduate Executive Board and serves on the Board of Directors of the Desert Flower Foundation. Mr. Kazam received his B.S. degree in Economics from the Wharton School of the University of Pennsylvania.

**Defendant Lee**

57.     Defendant Lee served as a director of SRNG from its IPO until the Merger.

58.     The Proxy Statement stated the following about Defendant Lee:

***Isaac Lee*** has served on the SRNG Board since the completion of its initial public offering. Mr. Lee is a journalist, entrepreneur, and a film and television producer. He is the founder of EXILE, a media company acquiring and developing premium original content for audiences across the U.S. and Latin America. Previously, Mr. Lee served as the Chief Content Officer for Univision and Televisa (the #1 media company in Spanish in the world). For almost 8 years, Mr. Lee ran the news department at Univision. Before Univision, Mr. Lee founded AnimalPolitico, the leading political and investigative news site in Mexico. He also founded and led PageOne Media, publisher of PODER magazine in the U.S., Mexico, Colombia, Chile, Peru, and Venezuela, which was sold in 2006. When Mr. Lee was 25 he was appointed editor-in-chief of Cromos, the oldest magazine in Latin America and at 26 he was appointed editor-in-chief of Semana, Colombia's most influential magazine. In scripted content, Mr. Lee produced the feature film Paraíso Travel, three seasons of El Chapo for Netflix as well as the mini-series for TVE Operación Jaque, which was nominated for an international Emmy. He made the first deal with Amazon in Mexico and developed five series for Netflix. In non-scripted, Mr. Lee has produced several documentaries, including the award-winning documentary Science Fair (NatGeo), Outpost (HBO), Residente (Netflix) and Jaque (NatGeo). Mr. Lee is a Board Member of the Associated Press, the Committee to Protect Journalists and Columbia Journalism Review. Mr. Lee is also a member of the Board of Advisors of the Institute of Politics of the University of Chicago, trustee of the Hirshhorn Museum and an active member of the Council On Foreign Relations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Defendant Leiweke**

59.     Defendant Leiweke served as a director of SRNG from its IPO until the Merger.

60.     The Proxy Statement stated the following about Defendant Leiweke:

*Timothy Leiweke* has served on the SRNG Board since the completion of its initial public offering. Mr. Leiweke founded Oak View Group ("OVG") in 2015 and continues to serve as the company's Chief Executive Officer. With over 30 years of global sports and entertainment experience, Mr. Leiweke is a widely respected industry leader and has been deeply involved in the evolution of NHL, NBA and MLS. Mr. Leiweke partnered with music industry titan Irving Azoff to launch OVG, a developmental and investment company comprised of an Arena & Stadium Alliance, a sponsorship subsidiary, a security advisory group, and a venture fund division which most recently acquired Pollstar publication and conferences. Prior to OVG, Mr. Leiweke served as President and Chief Executive Officer of Maple Leaf Sports & Entertainment. In his first year with Maple Leaf Sports & Entertainment, Mr. Leiweke led a transformation of the Toronto Raptors, which resulted in a record for wins and back-to-back Division Championships. With Toronto FC, Mr. Leiweke orchestrated a dramatic overhaul, which ignited the club's first ever playoff berth in 2015. It was during this time that Mr. Leiweke ranked fifth on the Sports Business Journal's *50 Most Influential* and eighth on *Billboard's 100 Most Powerful in Music*—the only President & CEO to rank on both lists. During his 18 years at the helm of Anschutz Entertainment Group ("AEG"), Mr. Leiweke led the company's evolution into a global live entertainment organization capable of developing, producing, marketing and managing sports and entertainment programming in its venues worldwide. It was through Mr. Leiweke's vision that the $2.5 billion L.A. LIVE complex was built in Downtown Los Angeles, adjacent to the STAPLES Center and the Los Angeles Convention Center. In addition, Mr. Leiweke was the architect of AEG's global expansion, including development of O2 Arenas and the stadiums in London, China and Germany. Mr. Leiweke then built AEG Live into the second largest promoter in the world with artists including Paul McCartney, Taylor Swift, Rolling Stones, Black Eyed Peas, Kenny Chesney, Celine Dion, The Eagles and Katy Perry. AEG Live also became one of the world's largest festival organizers through partnerships with the Coachella and Stagecoach Festivals. Deeply committed to the community, Mr. Leiweke and his family dedicate their time to a range of charitable initiatives. Through their work, the Leiwekes have been recognized by numerous organizations, including the Anti-Defamation League's *2007 Humanitarian Award*, *Father of the Year* by the American Diabetes Association and the Muscular Dystrophy Association's Man of the Year.

**Defendant Miller**

61.     Defendant Miller served as a director of SRNG from its IPO until the Merger.

62.     The Proxy Statement stated the following about Defendant Miller:

*Dennis A. Miller* has served on the SRNG Board since the completion of its initial public offering. Mr. Miller served on the board of directors of Global Eagle Acquisition Corp. from May 2011 until the consummation of its business combination in January 2013. Mr. Miller currently serves on the board of Nexstar Broadcasting. Mr. Miller also served

on the boards of Radio One, Inc. from September 2011 until 2015 and Storage Upreit Partners, LP from February 2012 until February 2014. In 2005, Mr. Miller became a General Partner of Spark Capital LLC, a venture fund focusing on the tech industry, and is currently a venture partner. In 2000, Mr. Miller became a managing director of Constellation Ventures, the venture partner business anchored by Bear Stearns. From 1998 to 2000, Mr. Miller was executive vice president of Lions Gate. Prior to joining Lions Gate, from 1995 to 1998, Mr. Miller was executive vice president of Sony Pictures Entertainment. While at Sony Pictures Entertainment, Mr. Miller was responsible for all television operations and was actively involved with strategic planning and new media. From 1990 to 1996, Mr. Miller was executive vice president of Turner Network Television ("TNT"), a cable television channel, and in 1993 he took on the additional responsibility for the Turner Entertainment Company, a subsidiary of Turner Broadcasting System, Inc. Mr. Miller received his J.D. Degree from Boalt Law School in 1982 and his B.A. degree in political science from the University of California, San Diego in 1978.

**Defendant Paul**

63.     Defendant Paul served as a director of SRNG from its IPO until the Merger.

64.     The Proxy Statement stated the following about Defendant Paul:

***Laurence E. Paul, M.D.***, has served on the SRNG Board since the completion of its initial public offering. Dr. Paul has been the co-founder and managing principal of Laurel Crown Partners since 2001. Dr. Paul also served on Flying Eagle's board of directors from May 2020 through the consummation of its business combination with Skillz, Inc. in December 2020. Dr. Paul has extensive experience in private equity investing, the identification, negotiation and purchase of new portfolio companies, sale of existing entities and general strategic and financial involvement and oversight of portfolio companies. From 1994 to 2001, Dr. Paul worked at Donaldson, Lufkin & Jenrette and then Credit Suisse (NYSE: CS) in investment banking, including as a managing director in the Investment Banking Division. Dr. Paul is currently a member of the board of directors for several non-profit organizations and portfolio companies including: Harvard Medical School's Board of Fellows, Harvard Alumni Association, Children's Hospital of Los Angeles, Pittsburgh Steelers Football Club, Pro Football Hall of Fame, Crew Knitwear, Kova International, and Vereco. From 2006 to 2017, Dr. Paul was a member of the Board of Governors of the American Red Cross, during which time he served in many roles including Vice Chairman of the board and chairman of the audit committee. Dr. Paul holds a B.A. from Harvard College, an M.D. from Harvard Medical School and an M.B.A. from Stanford University.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

65.     By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of the Company and because of their ability to control the Company's business and corporate affairs, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and

are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

66.    Each controlling shareholder, director, and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

67.    The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

68.    To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

69.    Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of the Company, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also the controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of the Company's Board at all relevant times.

70.    As the controlling shareholders, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance,

growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

71.     To discharge their duties, the controlling shareholders, officers, and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Company's controlling shareholders, officers, and directors were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to New Ginkgo's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices. In light of the Merger, this includes the responsibility to remain informed as to the operations of Legacy Ginkgo, with which SRNG combined as part of the Merger and which became a part of the Company;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable

laws and any financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

72.     Each of the Individual Defendants further owed to the Company and the shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

73.     At all times relevant hereto, the Individual Defendants were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

74.     Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

75.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

76.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or

assisted each other in breaching their respective duties.

77.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the operations, financial condition, legal compliance, future business prospects, and internal controls of the Company and of Legacy Ginkgo; and (iii) artificially inflate the Company's stock price.

78.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of the Company was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

79.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his overall contribution to and furtherance of the wrongdoing.

80.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

## NEW GINKGO'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### *New Ginkgo's Code of Conduct*

81.    The Code of Conduct states that it "applies to all of the directors, officers, employees and contractors of New Ginkgo—when we refer to 'you' in this Code, this is who is included."

82.     In a section titled "Reporting Violations of the Code," the Code of Conduct states as follows, in relevant part:

All employees and directors have a duty to report any known or suspected violation of this Code, including violations of the laws, rules, regulations or policies that apply to Ginkgo. If you know of or suspect a violation of this Code, immediately report the conduct to your manager and/or submit a report through EthicsPoint as described above. If your manager believes there has been a violation of this Code, your manager will be required to report the conduct on EthicsPoint. If your concern relates specifically to any practices, procedures, or circumstances that raise concerns about the integrity of Ginkgo's financial disclosures, books, and/or records, then you should consult Ginkgo's Policies and Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud, or Auditing matters.

83.     In a section titled "Identifying Potential Conflicts of Interest," the Code of Conduct provides as follows, in relevant part:

We recognize and respect your right to engage in outside activities that you deem proper and desirable, provided that these activities do not impair or interfere with the performance of your duties to Ginkgo or your ability to act in Ginkgo's best interests. In most, if not all, cases, this will mean that you must avoid situations that present a potential or actual conflict between your personal or business interests and Ginkgo's interests.

A conflict of interest occurs when your personal or business interest interferes (or appears to interfere) with the interests of the Company, which for example may involve time commitments working for other companies or organizations that are inconsistent with the time commitments that we expect you to devote to Ginkgo. A conflict of interest can arise whenever you, as an employee, officer, director or contractor, take action or have an interest that prevents you from performing your Company duties and responsibilities honestly, objectively, and effectively.

84.     In a section titled "Protection and Use of Company Assets," the Code of Conduct provides as follows, in relevant part:

Loss, theft or misuse of our assets has a direct impact on our business and financial status. You are expected to protect Ginkgo's assets that are entrusted to your or your designated agent and to protect Ginkgo's assets in general. You are also expected to take steps to ensure that our assets are used only for legitimate business purposes.

85.     In a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides as follows:

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding Ginkgo's business, financial condition and results of operations. We expect you to provide accurate, complete and timely reporting to Ginkgo as applicable to your responsibilities at Ginkgo. Please refer to Ginkgo's Policies and

Procedures for Complaints Regarding Accounting, Internal Accounting Controls, Fraud, or Auditing Matters for more details.

The people working in our finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate in all material respects, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all applicable standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

86.    In a section titled "Compliance with Laws and Regulations," the Code of Conduct provides as follows, in relevant part:

You have an obligation to comply with all laws, rules and regulations applicable to our operations. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should promptly seek advice from your manager or the General Counsel.

87.    In a section titled "Public Communications and Regulation FD," the Code of Conduct provides as follows, in relevant part:

a) Public Communications Generally
We value transparency and want to build and maintain trust with our stakeholders and the broader community. What is written or said about us in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide accurate information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. We have adopted Guidelines for Corporate Disclosure to build trust with our stakeholders and in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

b) Compliance with Regulation FD
In connection with our public communications, we are required to comply with a regulation under the federal securities laws referred to as Regulation FD (which stands for "fair disclosure"). Regulation FD requires that, when we disclose material nonpublic information about Ginkgo to securities market professionals or stockholders (where it is reasonably foreseeable that the stockholders will trade on the information), we must also disclose the information to the public. "Securities market professionals" generally include analysts, institutional investors and other investment advisors.

We have designated certain individuals as "spokespersons" who are responsible for communicating with analysts, institutional investors and representatives of the media. If you are not a designated spokesperson of Ginkgo, you should not communicate information about Ginkgo to analysts, institutional investors or representatives of the media, except at the request of our designated spokespersons.

***Audit Committee Charter***

88.     The Company's Audit Committee Charters states that the Audit Committee's purposes include assisting the Board in the oversight of:

> (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; and (iv) the performance of the Company's internal audit function (including any third party providing internal audit services) and independent auditor.

89.     The Audit Committee Charter also describes the Audit Committee's responsibility to "review and discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies." Additionally, the Audit Committee Charter tasks the Audit Committee with the responsibility to "review and oversee related person transactions in accordance with the Company's related person transaction policy and procedures." Furthermore, the Audit Committee Charter tasks the Audit Committee with compliance oversight, as follows:

> The Committee must discuss with management and the independent auditor any correspondence with regulators or governmental agencies, and any published reports that raise material issues regarding the Company's financial statements. The Committee must discuss with the Company's General Counsel legal matters that may have a material impact on the financial statements or the Company's compliance policies. The Committee will advise the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations, and with the Company's code of business conduct and ethics.

90.     In violation of Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Misclassification Misconduct, to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to avoid conflicts of interest, protect Company assets, ensure the accuracy of financial reports and public communications, comply with applicable laws and regulations, and report violations of the Code of Conduct.

91.     In violation of the Audit Committee Charter, Defendants Henry, Dekkers, and Sloan (the "Audit Committee Defendants") conducted little, if any, oversight of the Company's engagement in the

Individual Defendants' scheme to engage in the Misclassification Misconduct, to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Audit Committee Defendants failed to review and discuss the Company's earnings press releases and failed to adequately oversee related person transactions, the integrity of the Company's financial statements, the Company's compliance with applicable laws and regulations, and the performance of the Company's internal audit function. Additionally, the Audit Committee Defendants failed to cause the Company to maintain adequate internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

92.    Ginkgo is a biotechnology company incorporated in Delaware and based in Boston, Massachusetts. The Company also maintains an office in Emeryville, California. Ginkgo seeks to build a platform for cell programming by combining biology, data science, automation, software, and scale to produce solutions in the food, pharmaceuticals, and materials industries, among others.

93.    Throughout the Relevant Period, the Individual Defendants touted Ginkgo's Foundry revenue and new partnership agreements while failing to disclose the full extent to which the Company was reliant on revenue from related parties. Furthermore, the Individual failed to disclose that the Company was engaging in the Misclassification Misconduct by misclassifying and underreporting related-party revenue, concealing the Company's dependence on related parties.

94.    On September 16, 2021, Legacy Ginkgo combined with SRNG in the Merger, creating New Ginkgo, which now trades publicly on the NYSE under the ticker symbol "DNA." The SRNG Defendants caused SRNG to acquire Legacy Ginkgo on terms that were unfavorable to SRNG in light of the misconduct described herein. The Legacy Ginkgo Defendants and Defendant Belldegrun aided and abetted the misconduct of the SRNG Defendants in effecting the Merger.

95.    Following the Merger, the New Ginkgo Defendants continued, or caused the Company to continue, engaging in the Misclassification Misconduct, which remained undisclosed until the release of

the Report on October 6, 2021.

96.     Furthermore, throughout the Relevant Period, the Individual Defendants caused the Company to fail to maintain adequate internal controls, as evidenced by the Misclassification Misconduct and the Company issuing the false and misleading statements at issue.

**The Misclassification Misconduct**

97.     As detailed in the Report published by Scorpion, Ginkgo engaged in the Misclassification Misconduct by concealing the true extent of its dependence on related party revenue and by misclassifying and underreporting revenue from related parties.

98.     The Company is closely intertwined with certain related parties. As alleged in the Report, certain of the Company's related parties, such as Allonnia, Joyn Bio LLC, and Motif Foodworks, shared a telephone number with and/or were in the same facility as Ginkgo. Furthermore, the websites for Ginkgo's related party entities are lacking in content and appear to be designed and/or run by the Company. For instance, the Report noted that Allonnia's website stated: "Powered by GINKGO BIOWORKS." It currently lists Ginkgo under the category "Investors and Partners." Like the websites of these related parties, the web presence of the employees of Ginkgo's related parties is similarly insignificant, casting doubt on any significant headcount at these companies. As noted in the Report, certain related parties either lack significant employee presence on the popular business networking site LinkedIn and/or lack crucial corporate staff, such as finance, treasury, human resources, and legal staff.

99.     The close intertwining of Ginkgo with its related parties is further underlined by the revolving nature of employment at Ginkgo and its related parties. For instance, as noted by the Report, Allonnia, one of Ginkgo's related parties, hired a temporary CFO that appears to serve in the same role for *three different* entities, one of which is Motif, another Ginkgo related party. Furthermore, as noted in the Report, at least one employee switched from Ginkgo to a related party company while still receiving pay or benefits from Ginkgo. Thus, the intertwining of the related parties with Ginkgo tends to show that the related party entities are not designed to carry on independently from Ginkgo, and that they in fact are not independent.

100.     As alleged in the Report, the Company's revenue practices with respect to these closely

related parties were "circular." For instance, one employee stated to Scorpion that "the circular revenue" was "a big red flag." Here, the term "circular revenue" relates to the practice of "round-tripping" revenue, or the practice of engaging in transactions between companies that may not provide any economic benefit, for the purpose of enhancing the image of one or both companies.

101.    As alleged in the Report, Ginkgo engaged in "round-tripping" of revenue with these closely related parties. For instance, Ginkgo made an investment of $80 million in a company called Synlogic, Inc. ("Synlogic"), $30 million of which was then paid back to Ginkgo by Synlogic at closing. About this transaction, an individual interviewed by Scorpion stated, "they provided Synlogic $30 million, Synlogic turned around and paid it to them, so they were registering their own money as revenue."

102.    As alleged in the Report, Ginkgo has misclassified and underreported its "circular," or "round-tripped" related-party revenue. In Synlogic's annual report filed on March 25, 2021 on Form 10-K with the SEC, Synlogic stated that it used $13.6 million of pre-paid research and development expenses in the 2020 Fiscal Year. However, Ginkgo reported only $73,000 in related-party Foundry revenue from Synlogic for the 2020 Fiscal Year. As alleged in the Report, Synlogic's disclosures evidence that Ginkgo misclassified Synlogic's spending "in order to conceal [Ginkgo's] near-total dependence on parties it finances."

103.    Demonstrating that Ginkgo's commitment to the foregoing practices was affirmative and intentional, the individuals interviewed by Scorpion, who worked at either Ginkgo or its related parties, indicated that they had been terminated for refusing to "round-trip" funding. One ex-employee indicated awareness of "about three people" that got in trouble or were terminated for pushing back on the circular mechanism. Moreover, in interviews with Scorpion, former employees described fear inside Ginkgo that its business model could not withstand regulatory scrutiny, demonstrating the motive of the Individual Defendants to conceal information related to the Misclassification Misconduct.

104.    As alleged in the Report, this misconduct had a direct effect on Ginkgo's revenue reporting. The Report alleged that, had Ginkgo included Synlogic's full Foundry spending, Ginkgo's "related party revenues as a percent of total would have jumped from 72% to 95%." Thus, the Misclassification Misconduct concealed from the investing public the true extent of Ginkgo's dependence on related party

revenue.

105.    The Ginkgo Defendants breached their fiduciary duties to the Company by causing it to engage in the Misclassification Misconduct, which misrepresented the true state of the Company's financial condition and which remained undisclosed until the publication of the Report.

**The Merger and the Overpayment Misconduct**

106.    On February 26, 2021, SRNG's IPO closed. As a blank check company, SRNG had no operations of its own, but instead sought to combine with an operating company and take on that company's operations as its own. In such a transaction, the operating company, here Legacy Ginkgo, benefits from the business combination by getting access to investment without being subjected to the more formal requirements imposed in the IPO process. The SPAC, here SRNG, benefits if the combination with the target company is prudent and enhances the value of the SPAC's shares.

107.    SRNG had only a two-year period in which to complete an initial business combination. If it was unsuccessful in completing an initial business combination in that period, SRNG would cease all operations, redeem all shares, and liquidate and dissolve. If this were to happen, Sponsor and its affiliates—including the SRNG Defendants—would not reap the windfall they would if they successfully guided SRNG through a merger. Thus, the SRNG Defendants were motivated to quickly complete an initial business combination.

108.    According to the Proxy Statement, the terms of the merger agreement between Legacy Ginkgo and SRNG provided, *inter alia*, as follows:

> SRNG has agreed to acquire all of the outstanding equity interests of Ginkgo for approximately $15 billion in aggregate consideration in the form of New Ginkgo common stock valued at $10 per share (the "Base Equity Consideration"), plus, subject to the vesting conditions based on New Ginkgo's stock trading price as further described in this proxy statement/prospectus, up to a total of 180 million shares of New Ginkgo common stock (the "Earn-out Consideration"). Ginkgo stockholders will receive the Base Equity Consideration and the Earn-Out Consideration in the form of shares of New Ginkgo Class A common stock or New Ginkgo Class B common stock as determined in accordance with the Merger Agreement.[11]

---

[11] The business combination agreement also set forth the terms for the allocation of the Base Equity Consideration among Ginkgo equity holders and the terms under which the holders of Legacy Ginkgo stock, units, options, and warrants would be able to receive proportional amounts of the Earn-Out consideration.

109.     The Merger closed on September 16, 2021 on the terms set forth in the merger agreement. SRNG acquired all of the outstanding equity interests of Legacy Ginkgo for approximately $15.8 billion in aggregate consideration in the form of common stock of New Ginkgo valued at $10 per share, plus approximately 188.7 million earn-out shares of New Ginkgo stock. These terms were unfavorable and unreasonable to SRNG's shareholders, given that Legacy Ginkgo was engaged in the undisclosed Misclassification Misconduct. This misconduct made Legacy Ginkgo a less valuable acquisition than SRNG's shareholders were led to believe. Thus, the SRNG Defendants breached their fiduciary duties to SRNG by causing it to acquire Legacy Ginkgo on unfavorable terms.

**False and Misleading Statements**

***May 11, 2021 Press Release***

110.     On May 11, 2021, the Company issued a press release titled "Ginkgo Bioworks to Become a Public Company and Expand its Leading Platform for Cell Programming," which was attached to the Company's Form 8-K filed the same day. The press release announced the intention of SRNG and Legacy Ginkgo to enter into a business combination to take Legacy Ginkgo public through a SPAC merger. The press release touted that Ginkgo had an equity valuation of $15 billion, stating, "[t]he transaction implies a pre-money equity valuation for Ginkgo of $15.0 billion, and is expected to provide up to $2.5 billion of gross cash proceeds."

***May 14, 2021 Form S-4***

111.     On May 14, 2021, the Company filed a registration statement on Form S-4 with the SEC (the "Registration Statement"). Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller, and Paul signed the Registration Statement.

112.     The Registration Statement touted the Company's Foundry revenues as follows:

Our business model mirrors the structure of our platform and we are compensated in two primary ways. First, we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services. The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023. ***Foundry revenue was $59.2 million for the year ended December 31, 2020. Additionally, we negotiate a value share with our customers (typically in the form of royalties, milestones, and/or equity***

*interests) in order to align our economics with the success of the programs enabled by our platform. As we add new programs, our portfolio of programs with this "downstream" value potential grows.* Through these value shares, we are tapping into what industry sources expect to be a $2 to $4 trillion market for bioengineered products.

(Emphasis added.)

113.    In a section titled "Generating Economic Value Through Revenue and Downstream Value Share," the Registration Statement stated as follows: "Our cell programming platform is a key enabling technology and source of intellectual property for our customers' products. We earn both Foundry revenue for our research and development ("R&D") services as well as a share of the value of products created using our platform." In the same section, the Company stated, "Downstream value share arrangements which involve equity interests fall into two categories: Platform Ventures and Structured Partnerships."

114.    In describing Legacy Ginkgo's Foundry revenue, the Registration Statement stated as follows:

> We generate Foundry revenue through the execution of license and collaboration agreements whereby customers obtain license rights to our proprietary technology and intellectual property for use in the development and commercialization of engineered organisms and derived products. Under these agreements, we typically provide R&D services for cell programming with the goal of producing an engineered cell that meets a mutually agreed specification. Our customers obtain license rights to the output of our services, which are primarily the optimized strains or cell lines, in order to manufacture and commercialize products derived from that licensed strain or cell line. Generally, the terms of these agreements provide that we receive some or all of the following: (i) upfront payments upon consummation of the agreement that are recognized over our period of performance, (ii) reimbursement for costs incurred for R&D services, (iii) milestone payments upon the achievement of specified technical and/or commercial criteria, (iv) royalties on sales of products from or comprising engineered organisms arising from the license and collaboration agreement and (v) royalties related to cost of goods sold reductions realized by our customers. For the years ended December 31, 2020 and 2019, royalties did not comprise a material amount of our revenue.
>
> ***Foundry revenue includes transactions with Platform Ventures (Motif, Joyn and Allonnia) as well as other Structured Partnerships (Genomatica and Synlogic) where, as part of these transactions, we received an equity interest in such entities. Specifically related to the Platform Ventures, in these transactions, we received upfront non-cash consideration in the form of common equity interests in these entities, while the Platform Ventures each received cash equity investments from industry-leading strategic partners and financial investors. We view the upfront non-cash consideration as prepayments for licenses which will be granted in the future as we complete mutually agreed upon technical development plans. In these instances, we also receive cash payments for our costs incurred for the R&D services performed by us, plus a margin.*** We are not compensated through additional milestone or royalty payments under these

arrangements. Our transactions with Genomatica and Synlogic included the purchase of equity securities and the provision of R&D services. As we perform R&D services under the mutually agreed upon development plans, we recognize a reduction in the prefunded obligation based on a cost incurred, plus margin. Because of our equity holdings in these entities, each is considered as a related party. These arrangements are further described in Notes 8, 17 and 21 of our audited consolidated financial statements included elsewhere in this proxy statement/prospectus.

Downstream value share in the form of equity interest appreciation is not recognized as revenue but is expected to contribute to future cash flows upon liquidation, the amount and timing of which is inherently unpredictable. Equity investees are accounted for as equity method investments or cost method investments.

(Emphasis added.)

115.    The Registration Statement reported the following revenue from related parties:

**21.  Related Parties**

Related party transactions included in the Consolidated Balance Sheets, excluding the Company's investments and equity method investments, are summarized below (in thousands):

|  | Joyn | Motif | Genomatica | Allonnia | Synlogic | Total |
|---|---|---|---|---|---|---|
| **Balances as of December 31, 2020** | | | | | | |
| Accounts receivable, net | $ — | $ 2,403 | $ 1,500 | $ 1,309 | $ — | $ 5,212 |
| Prepaid expenses and other current assets | $ 24 | $ 232 | $ — | $ 13 | $ — | $ 269 |
| Deferred revenue, current and non-current | $ 9,862 | $53,952 | $ 30,128 | $26,064 | $ 72 | $120,078 |
| **Balances as of December 31, 2019** | | | | | | |
| Accounts receivable, net | $ 163 | $ 4,054 | $ — | $ — | $ — | $ 4,217 |
| Deferred revenue, current and non-current | $17,135 | $62,513 | $ 38,059 | $24,480 | $ 144 | $142,331 |

Related party transactions included in the Consolidated Statements Operations and Comprehensive Loss, excluding the losses on the Company's investments and equity method investments, are summarized below (in thousands):

|  | Joyn | Motif | Genomatica | Allonnia | Synlogic | Glycosyn | Total |
|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2020** | | | | | | | |
| Foundry revenue | $ 7,273 | $ 20,798 | $ 9,431 | $ 4,960 | $ 73 | $ — | $ 42,535 |
| Other income, net | $ 407 | $ 314 | $ — | $ — | $ — | $ — | $ 721 |
| **For the Year Ended December 31, 2019** | | | | | | | |
| Foundry revenue | $ 9,349 | $ 18,986 | $ 6,248 | $ — | $ 17 | $ 668 | $ 35,268 |
| Interest income | $ — | $ — | $ — | $ — | $ 163 | | $ 163 |
| Other income, net | $ 222 | $ 42 | $ — | $ — | $ — | $ 1,530 | $ 1,794 |

116.    On June 28, 2021, July 16, 2021, August 4, 2021, and August 9, 2021, SRNG filed amended versions of the Registration Statement on Forms S-4/A with the SEC. These filings contained substantially identical statements to those contained in the original, May 14, 2021 Registration Statement.

***August 12, 2021 Press Release***

117.    On August 12, 2021, Legacy Ginkgo issued a press release announcing a partnership with Antheia, Inc. ("Antheia") "to accelerate the development and production of essential medicines." This press release was just one of a number of announcements of new R&D partners in the months leading up

to the Merger. The press release stated that "Antheia plans to leverage Ginkgo's high throughput enzyme design and screening capabilities to broaden its pipeline of critical active pharmaceutical ingredients (APIs) and key starting materials (KSMs)." The press release did not disclose that Viking Global Opportunities Illiquid Investments Sub-Master LP ("Viking") led Antheia's $73 million financing just weeks prior to the August 12, 2021 announcement of the partnership between Ginkgo and Antheia. Viking, a major investor in the Company, held 25.9% of the Company's Class A common stock as of November 8, 2021.

### *August 13, 2021 Proxy Statement*

118.    On August 13, 2021, the Company filed the Proxy Statement with the SEC. Defendants Sloan, Baker, Delman, Kazam, Lee, Leiweke, Miller, and Paul solicited the Proxy Statement. The Proxy Statement contained material misstatements and omissions, and it was filed, *inter alia*, pursuant Section 14(a) of the Exchange Act.

119.    The Proxy Statement called for Company shareholders to, among other things: (1) approve numerous proposals necessary to effectuate the Merger; (2) approve a proposal to domesticate SRNG, which had previously been a Cayman Islands company; (3) to approve and adopt certain governing documents; (4) to elect Defendants Kelly, Shetty, Belldegrun, Dekkers, Henry, Sankar, and Sloan to the Board; (5) to approve the issuance of shares of Legacy Ginkgo Class A common stock and shares of SRNG Class A common stock to certain investors; (6) to approve the 2021 Incentive Award Plan, (the "2021 Plan"); and (7) to approve the 2021 Employee Stock Purchase Plan.

120.    The Proxy Statement touted the Company's inflated revenues and stated the following concerning the Company's business model:

> Our business model mirrors the structure of our platform and we are compensated in two primary ways. First, we charge usage fees for Foundry services, in much the same way that cloud computing companies charge usage fees for utilization of computing capacity or contract research organizations (CROs) charge for services. The total addressable market (TAM) for our Foundry revenue includes the market for biotech labor and tools, which industry sources estimate will be approximately $40 billion in 2021 and which is expected to grow at a CAGR of approximately 20% from 2021 to 2023. ***Foundry revenue was $59.2 million for the year ended December 31, 2020 and $22.5 million for the three months ended March 31, 2021. Additionally, we negotiate a value share with our customers (typically in the form of royalties, milestones, and/or equity interests) in order to align our economics with the success of the programs enabled by our platform. As we***

1
2
***add new programs, our portfolio of programs with this "downstream" value potential grows.*** Through these value shares, we are tapping into what industry sources expect to be a $2 to $4 trillion market for bioengineered products.

3
(Emphasis added.)

4        121.    In a section titled "Generating Economic Value Through Revenue and Downstream Value

5    Share," the Proxy Statement stated as follows: "Our cell programming platform is a key enabling

6    technology and source of intellectual property for our customers' products. We earn both Foundry revenue

7    for our research and development ("R&D") services as well as a share of the value of products created

8    using our platform." In the same section, the Company stated, "Downstream value share arrangements

9    which involve equity interests fall into two categories: Platform Ventures and Structured Partnerships."

10        122.    In describing Gingko's Foundry revenue, the Proxy Statement stated as follows:

11
12
13
14
15
16
17
18
19
20
We generate Foundry revenue through the execution of license and collaboration agreements whereby customers obtain license rights to our proprietary technology and intellectual property for use in the development and commercialization of engineered organisms and derived products. Under these agreements, we typically provide R&D services for cell programming with the goal of producing an engineered cell that meets a mutually agreed specification. Our customers obtain license rights to the output of our services, which are primarily the optimized strains or cell lines, in order to manufacture and commercialize products derived from that licensed strain or cell line. Generally, the terms of these agreements provide that we receive some combination of (i) upfront payments upon consummation of the agreement that are recognized over our period of performance, (ii) reimbursement for costs incurred for R&D services, (iii) milestone payments upon the achievement of specified technical and/or commercial criteria, (iv) royalties on sales of products from or comprising engineered organisms arising from the license and collaboration agreement and (v) royalties related to cost of goods sold reductions realized by our customers. For the three months ended March 31, 2021 and 2020 and the years ended December 31, 2020 and 2019, royalties did not comprise a material amount of our revenue.

21
22
23
24
25
26
27
28
***Foundry revenue includes transactions with Platform Ventures (Motif, Joyn, Allonnia and Kalo) as well as other Structured Partnerships (Genomatica and Synlogic) where, as part of these transactions, we received an equity interest in such entities. Specifically related to the Platform Ventures, in these transactions, we received upfront non-cash consideration in the form of common equity interests in these entities, while the Platform Ventures each received cash equity investments from industry-leading strategic partners and financial investors. We view the upfront non-cash consideration as prepayments for licenses which will be granted in the future as we complete mutually agreed upon technical development plans. In these instances, we also receive cash payments for our costs incurred for the R&D services performed by us, plus a margin.*** We are not compensated through additional milestone or royalty payments under these arrangements. Our transactions with Genomatica and Synlogic included the purchase of equity securities and the provision of R&D services. As we perform R&D services under the mutually

agreed upon development plans, we recognize a reduction in the prefunded obligation based on a cost incurred, plus *margin. Because of our equity holdings in these entities, each is considered as a related party. These* arrangements are further described in Notes 8, 17 and 21 of our audited consolidated financial statements and in Notes 7, 8, 15 and 17 of our unaudited condensed consolidated financial statements included elsewhere in this proxy statement/prospectus.

Downstream value share in the form of equity interest appreciation is not recognized as revenue but is expected to contribute to future cash flows upon liquidation, the amount and timing of which is inherently unpredictable. Equity investees are accounted for as equity method investments or cost method investments.

(Emphasis added.)

123.    The Proxy Statement reported revenue from related parties as follows:

**21.  Related Parties**

Related party transactions included in the Consolidated Balance Sheets, excluding the Company's investments and equity method investments, are summarized below (in thousands):

| | Joyn | Motif | Genomatica | Allonnia | Synlogic | Total |
|---|---|---|---|---|---|---|
| **Balances as of December 31, 2020** | | | | | | |
| Accounts receivable, net | $  — | $ 2,403 | $  1,500 | $ 1,309 | $  — | $  5,212 |
| Prepaid expenses and other current assets | $   24 | $   232 | $   — | $   13 | $  — | $     269 |
| Deferred revenue, current and non-current | $ 9,862 | $53,952 | $  30,128 | $26,064 | $   72 | $120,078 |
| **Balances as of December 31, 2019** | | | | | | |
| Accounts receivable, net | $   163 | $ 4,054 | $   — | $   — | $  — | $  4,217 |
| Deferred revenue, current and non-current | $17,135 | $62,513 | $  38,059 | $24,480 | $  144 | $142,331 |

Related party transactions included in the Consolidated Statements Operations and Comprehensive Loss, excluding the losses on the Company's investments and equity method investments, are summarized below (in thousands):

| | Joyn | Motif | Genomatica | Allonnia | Synlogic | Glycosyn | Total |
|---|---|---|---|---|---|---|---|
| **For the Year Ended December 31, 2020** | | | | | | | |
| Foundry revenue | $ 7,273 | $ 20,798 | $   9,431 | $ 4,960 | $   73 | $  — | $ 42,535 |
| Other income, net | $   407 | $    314 | $   — | $   — | $  — | $  — | $     721 |
| **For the Year Ended December 31, 2019** | | | | | | | |
| Foundry revenue | $ 9,349 | $ 18,986 | $   6,248 | $   — | $   17 | $  668 | $ 35,268 |
| Interest income | $   — | $   — | $   — | $   — | $  — | $  163 | $     163 |
| Other income, net | $   222 | $     42 | $   — | $   — | $  — | $ 1,530 | $  1,794 |

124.    The Proxy Statement also stated the following regarding the Board's, and each Board committee's, risk oversight functions:

The New Ginkgo Board will have extensive involvement in the oversight of risk management related to New Ginkgo and its business and will accomplish this oversight through the regular reporting to the board of directors by the audit committee. The audit committee will represent the New Ginkgo Board by periodically reviewing New Ginkgo's accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls and its compliance with legal and regulatory requirements. Through its regular meetings with management, including the finance, legal, internal audit and information technology functions, the audit committee will review and discuss all significant areas of New Ginkgo's business and summarize for the New Ginkgo Board all areas of risk and the appropriate mitigating

factors. In addition, the New Ginkgo Board will receive periodic detailed operating performance reviews from management.

125.    The Proxy Statement also listed certain responsibilities of the Audit Committee, which following the Merger would consist of Defendants Henry (as Chair), Dekkers, and Sloan. Specifically, the Proxy Statement that these responsibilities included:

> The purpose of the audit committee will be to prepare the audit committee report required by the SEC to be included in New Ginkgo's proxy statement and to assist the board of directors in overseeing and monitoring (1) the quality and integrity of the financial statements, (2) compliance with legal and regulatory requirements, (3) New Ginkgo's independent registered public accounting firm's qualifications and independence, (4) the performance of New Ginkgo's internal audit function and (5) the performance of New Ginkgo's independent registered public accounting firm.

126.    The Proxy Statement also had the following to say regarding the administration of the 2021 Plan:

> The 2021 Plan will be administered by the New Ginkgo Board, which may delegate its duties and responsibilities to one or more committees of its directors and/or officers (collectively, the "plan administrator"), subject to the limitations imposed under the 2021 Plan, Section 16 of the Exchange Act, stock exchange rules and other applicable laws. Following the Closing, we expect the compensation committee of the New Ginkgo Board to administer the 2021 Plan.

> The plan administrator will have the authority to take all actions and make all determinations under the 2021 Plan, to interpret the 2021 Plan and award agreements, to impose a mandatory holding period pursuant to which some or all participants may not dispose of or transfer shares issued under the 2021 Plan for a period of time determined by the plan administrator in its discretion, and to adopt, amend and repeal rules for the administration of the 2021 Plan as it deems advisable. The plan administrator will also have the authority to determine which eligible service providers receive awards, grant awards and set the terms and conditions of all awards under the 2021 Plan, including any vesting and vesting acceleration provisions, subject to the conditions and limitations in the 2021 Plan.

> The plan administrator may, without the approval of the shareholders, grant one or more awards under the 2021 Plan to any employee, director or consultant (including any employee, director or consultant who is a substantial security holder (i.e., those controlling 5% or more of the shares or voting power)) that represent, directly or indirectly, 1% or more of the common stock of New Ginkgo or 1% or more of the voting power of New Ginkgo.

127.    The Proxy Statement was materially misleading because it failed to disclose that: (1) the SRNG Defendants had failed to exercise risk oversight functions at SRNG and were causing or permitting SRNG to issue false and misleading statements, and thus the SRNG Defendants were breaching their

fiduciary duties; (2) the post-Merger Company's Board and Audit Committee would not adequately exercise these functions and would cause or permit the Company to continue issuing false and misleading statements; and (3) Defendant Sloan, who was on the SRNG Board and who continued serving as a director following the Merger, was improperly interested in receiving unjust compensation by seeking shareholder approval of the 2021 Plan.

128.    The Proxy Statement also failed to disclose that: (1) Ginkgo was engaging in the Misclassification Misconduct; (2) Ginkgo's failure to derive revenue from third parties left it almost fully dependent on related parties; (3) most or all of Ginkgo's revenue came from related parties that it created, funded, or controlled; (4) many of Ginkgo's new partners were undisclosed related parties; (5) as a result of the foregoing, the valuation of Ginkgo had been misrepresented to investors; and (6) the Company failed to maintain adequate internal controls.

129.    Furthermore, the Proxy Statement was materially false and misleading because it failed to disclose that the Merger solicited in the Proxy Statement was agreed to on terms that were unfavorable to SRNG shareholders in light of the Misclassification Misconduct. Thus, by failing to disclose that the SRNG Defendants were engaged in a scheme to engage in the Overpayment Misconduct, the Proxy Statement was materially misleading.

130.    As a result of the material misstatements and omissions contained in the Proxy Statement, Company shareholders, *inter alia*: (1) approved numerous proposals necessary to effectuate the Merger, the terms of which were unfavorable to SRNG shareholders, who were unknowingly sanctioning the Overpayment Misconduct; (2) reelected Defendant Sloan to the Company's Board, allowing him to continue breaching his fiduciary duties to the Company; (3) elected Defendants Kelly, Shetty, Belldegrun, Dekkers, Henry, and Sankar to the Board, who aided and abetted the SRNG Defendants' breaches of fiduciary duty and who breached their fiduciary duties to New Ginkgo; and (4) approved the 2021 Plan, under which the New Ginkgo Defendants became eligible to receive compensation that was unjust under the circumstances.

### September 7, 2021 Press Release

131.    On September 7, 2021, Legacy Ginkgo issued a press release announcing a partnership

with Tantu, a company that engineers biotherapeutic products for the treatment of gastrointestinal diseases. The press release stated that "Tantu will leverage Ginkgo's foundries to accelerate strain construction as a key step toward human clinical trials." It further stated as follows, in relevant part:

> Tantu is working to create an orally administered, living biotherapeutic that will produce and apply anti-inflammatory therapeutic proteins directly into diseased sites in the gut, resulting in improved gut barrier function and faster mucosal healing in patients where systemic anti-inflammatory therapies are not enough. Ginkgo plans to apply its automated foundry to accelerate the traditionally slow steps of candidate strain construction and genomic integration and validation with the aim of accelerating Tantu's first program and potentially helping them reach clinical proof of concept in patients faster.

132.    The statements contained in ¶¶ 110, 112–15, 117 and 131, as well as those referenced in ¶ 116 were materially false and misleading, and failed to disclose material facts necessary to make the statements not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Ginkgo was engaging in the Misclassification Misconduct; (2) Ginkgo's failure to derive revenue from third parties left it almost fully dependent on related parties; (3) most or all of Ginkgo's revenue came from related parties that it created, funded, or controlled; (4) many of Ginkgo's new partners were undisclosed related parties; (5) as a result of the foregoing, the valuation of Ginkgo had been misrepresented to investors; and (6) the Company failed to maintain adequate internal controls. As a result of the foregoing, Ginkgo's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

133.    On October 6, 2021, Scorpion released the Report, which alleged that the Company was a "colossal scam" and a "shell game" that was highly dependent on related party transactions. As part of its investigation, Scorpion conducted 21 interviews of former employees and executives of Ginkgo, as well as employees at the Company's purported customers.

134.    In describing the Company as a "shell game," the Report stated the following:

The majority of its foundry revenue, an absurd 72% in 2020, and essentially 100% of its deferred revenue are derived from related-party "customers" it created, funded, controls, or influences via its ownership position and board seats. Investments into these entities by Ginkgo and its largest investors are recycled back to Ginkgo and recorded as deferred or current revenue. The scheme reflects its woeful, decade-long failure to derive real revenue from third-party customers, forcing it to cover it up with a ploy that we believe to be enabled by its largest holders.

135.    The Report further alleged that Ginkgo had concealed the true extent of its dependence on

related party revenue, stating as follows:

> We believe that Ginkgo is concealing the true extent of its dependence on related party revenue and that it is far greater than it reports. ***We have uncovered a smoking gun that indicates that essentially ALL of its foundry revenue is derived from related parties, suggesting that Ginkgo has engaged in a brazen effort to misclassify and misreport related party revenue and deceive investors with phony accounting***. Our interviews with ex-employees indicated fear inside Ginkgo that its related-party model would fail regulatory scrutiny and derail an IPO, which we believe has prompted a cover-up of its magnitude.

(Emphasis added.)

136.    The Report alleged the following regarding Ginkgo's reported Foundry revenue:

> Ginkgo is opaque about the percent of its revenue and deferred revenue which is cash versus non-cash. Based on interviews with its related-party "customers," we believe that at least half of Ginkgo's reported foundry revenue is phantom –that is, non-cash and pure accounting hocus-pocus. We spoke with one of its largest such customers, from whom Ginkgo reported $38MM and $30MM of deferred revenue in 2019 and 2020. A senior employee there stated unequivocally that they have never paid Ginkgo cash for foundry services and are merely using "free" R&D credits following investments by Ginkgo and Viking. Giving away the essence of the scam, the customer stated they would not use Ginkgo if they had to pay cash, dismissing them as a failed contract research organization (CRO) that they neither trust to deliver nor could justify except under a round-tripping deal.

137.    The Report also claimed that former employees indicated there was fear inside Legacy

Ginkgo that its practices might not withstand regulatory scrutiny, posing an obstacle to taking it public

through a merger with SRNG:

> We noted earlier that the majority of Ginkgo's foundry revenue comes from related party entities: 65% in 2019, 72% in 2020, and 56% in 2021. We believe that the actual figure is essentially 100%, and think that Ginkgo is misclassifying and underreporting related party revenue. While the reported 60-70% percentage is bad enough and indicative of a broken, hocus-pocus business model, it's still better than 100%. Ginkgo can claim that at least 30-40% of foundry revenue comes from third parties, and that its reliance decreased in Q1 2021 to "only" 56%. Ex-employees indicated fear inside Ginkgo that its related party model doesn't stand up to regulatory scrutiny and could prevent it from going public – hence, we believe, an effort to fake the reported figure.

138.    The Report contained the following image depicting Legacy Ginkgo's reported related

party foundry revenues in 2019 and 2020:

| (in thousands) | | | Year Ended December 31, | |
|---|---|---|---|---|
| | | | 2020 | 2019 |
| Foundry revenue (includes related party revenue of $42,535 and $35,268, respectively) | | | $ 59,221 | $ 54,184 |

| in millions USD | 2019 | 2020 | Q1 2021 |
|---|---|---|---|
| **Foundry revenue by related party** | | | |
| Joyn | 9,349 | 7,273 | 1,598 |
| Motif | 18,986 | 20,798 | 5,492 |
| Genomatica | 6,248 | 9,431 | 3,298 |
| Allonnia | | 4,960 | 2,266 |
| Synlogic | 17 | 73 | 6 |
| Glycosyn | 668 | - | - |
| Kalo | - | - | - |
| **Total** | 35,268 | 42,535 | 12,660 |
| **Total foundry revenue** | 54,184 | 59,221 | 22,504 |
| | | | |
| Related parties as % of total foundry revenue | 65% | 72% | 56% |

*Reported related party foundry revenues totaled 65% in 2019 and 72% in 2020*

Source: Soaring Eagle Acquisition Corp prospectus 8/13/2021, https://www.sec.gov/Archives/edgar/data/0001830214/000119312521246097/d177007d424b3.htm; Scorpion Capital analysis and estimates

139.    The Report described how statements regarding Synlogic, a related party, demonstrated the underreporting of related-party revenue. Specifically, the Report stated as follows and included the following chart:

As we examined Ginkgo's related party disclosures, we noted a major anomaly: Ginkgo invested $80MM in Synlogic in 2018, but disclosed almost no revenue from it in 2019 and 2020 in the footnotes. Similarly, it reported a minimal deferred revenue balance with Synlogic, in Note 21 in the SPAC prospectus. In every other case, Ginkgo aggressively booked revenue and deferred revenue from related parties in which it invested. We were initially stumped.

*          *          *

As Synlogic is a publicly-traded microcap (ticker: SYBX) with $150MM market cap, we examined its SEC filings. We were amused, but not surprised, to discover that Synlogic's 2020 10K, under Note 16 for Related-Party Transactions, disclosed that Synlogic "used $13.6 million of the pre-paid research and development expenses" in 2020. This is in stark contrast to Ginkgo's related party disclosure, which reports only $73K of foundry revenue from Synlogic.

*          *          *

***Synlogic's disclosures suggest that Ginkgo has misclassified Synlogic's R&D spend in order to conceal its near-total dependence on parties it finances.*** Had Ginkgo included Synlogic's foundry spend of $13.6MM, related party revenues as a percent of total would have jumped from 72% to 95%-that is, Ginkgo would have had to admit that its foundry is a flop and that it can't get customers unless it gives them cash and round-trips the proceeds.

**Related party revenue as reported**

| in millions USD | 2020 |
|---|---|
| **Foundry revenue by related party** | |
| Joyn | 7,273 |
| Motif | 20,798 |
| Genomatica | 9,431 |
| Allonnia | 4,960 |
| Synlogic | 73 |
| Glycosyn | - |
| Kalo | - |
| **Total** | 42,535 |
| **Total foundry revenue** | 59,221 |
| **Related parties as % of total foundry revenue** | **72%** |

**Adjusted to include Synlogic revenue**

| in millions USD | 2020 |
|---|---|
| **Foundry revenue by related party** | |
| Joyn | 7,273 |
| Motif | 20,798 |
| Genomatica | 9,431 |
| Allonnia | 4,960 |
| Synlogic | 13,600 |
| Glycosyn | - |
| Kalo | - |
| **Total** | 56,062 |
| **Total foundry revenue** | 59,221 |
| **Related parties as % of total foundry revenue** | **95%** |

(Emphasis added.)

140. The Report also alleged that in the two months prior to the Report's release, and "timed with its SPAC listing, Ginkgo has announced a flurry of new R&D partners, a dog whistle that the scam is about to hit overdrive. We believe these 'partners' are undisclosed related parties and fronts." The Report stated: "Without proliferating new round-tripping arrangements, Ginkgo can't show 'growth' in Q3 and coming quarters." To explain its allegations concerning the "flurry of R&D partners," the Report stated as follows:

> The number of new "partners" announced in the last few weeks just prior to the first day of trading on Sep 17th is stunning. The partnerships are for everything under the sun: GI drugs, probiotics, herbal medicines and nutraceuticals, "biomaterials," dyes, a material inspired by spiders with "silk-like softness." Notably, not one of the releases below discloses a deal size – and all are silent on the critical question of whether they are undisclosed related parties – that is, whether Ginkgo or its investors like Viking are investors in the entities or are providing proceeds that will be round-tripped back to Ginkgo as "revenue" in coming quarters. We shortly reveal a smoking gun that exposes the rig as exactly that.

141. The Report took specific issue with the August 12, 2021 press release detailing the partnership with Antheia, stating, "[t]he press release for Ginkgo's Antheia partnership on Aug 12, 2021 *makes no mention of the fact that Viking led Antheia's $73MM financing a few weeks prior to the Ginkgo announcement.*"

(Emphasis added.)

142. The Report also described a partnership with Tantu, which the Company had announced on September 7, 2021:

Verified Shareholder Derivative Complaint

The Tantu partnership announced less than a week after Cambium is particularly grandiose: "Tantu will leverage Ginkgo's foundries to accelerate strain construction as a key step toward human clinical trials." Clinical trials presume an advanced program, typically after tens or hundreds of millions spent on R&D. Imagine our surprise after discovering that Tantu appears to have no full-time employees. It doesn't even appear to be a company, nor even a project –merely an idea. Co-founder Neel Joshi is a full time associate professor at Northeastern; a second co-founder is currently CEO of another startup; a third was a post-doc in Joshi's lab until August, when she took another job.

\*                 \*                 \*

Similar to Cambium, we suspected that Tantu is also an undisclosed related-party in which Ginkgo has or will make an investment which will be recycled back as "revenue." We spoke with an individual closely involved with Tantu, who indicated that Tantu has raised $50k to date via a university grant –"just enough to get a website and stuff like that and incorporate." The individual stated that Tantu "doesn't have money to pay" Ginkgo for R&D services, so "the deal ended up being like a deferred loan, essentially, for the work they are going to do." The individual did not disclose the amount of funding Ginkgo provided, but indicated it was similar in magnitude to a Series A round.

143.    The Report also alleged that,

Aside from its "customers" being related parties and effectively fake, ***we believe that Ginkgo takes the scam into even more aggressive territory by booking revenue from them that is simply fictitious, overstated, and/or based on overcharging.*** We begin with two observations: 1) the R&D and G&A services fees that Ginkgo charges these 'customers' and books as revenue and/or deferred revenue bears no plausible relationship to their size, suggesting they are fraudulent; 2) the timing of when Ginkgo books revenue and/or deferred revenue is equally implausible, sometimes before the entities even appear to have any employees or be functional, which further indicates they are simply sham transactions. For example, LinkedIn indicates only 6 employees at Allonnia LLC, yet Ginkgo records a $38MM deferred revenue balance, on top of booking $5MM of revenue from Allonnia in 2020 and $2.3MM in Q1 2021 – a $9MM annual run rate.

(Emphasis added.)

144.    On this news, the price per share of the Company's common stock fell $1.39, a decline of 11.6%, to close at $10.59 per share on October 6, 2021.

145.    On November 15, 2021, the Company filed its quarterly report on Form 10-Q with the SEC for the period ended September 30, 2021 (the "3Q21 10-Q"). In the 3Q21 10-Q, the Company stated that it had received an inquiry from the United States Department of Justice related to the allegations in the Report.

## DAMAGES TO THE COMPANY

146.    As a direct and proximate result of the Individual Defendants' misconduct, the Company

has lost and will continue to lose and expend many millions of dollars.

147.    Such expenditures include, but are not limited to, the fees associated with the Securities Class Action filed against the Company, its current CEO, its current CFO, and its former CEO (now a non-employee director), and any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

148.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company, including any unjust compensation paid to the New Ginkgo Defendants in connection with the 2021 Plan.

149.    Such expenditures also include, but are not limited to, the costs associated with remedying the Misclassification Misconduct, including any costs associated with implementing proper accounting measures and internal controls.

150.    In addition, such losses include the value for which SRNG was made to overpay for acquiring Legacy Ginkgo, which was acquired on terms unreasonable to SRNG given the undisclosed truth.

151.    As a direct and proximate result of the Individual Defendants' conduct, the Company has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

152.    Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of the Company, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, the aiding and abetting thereof, as well as for contribution under Sections 10(b) and 21D of the Exchange Act.

153.    The Company is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

154.   Plaintiff is, and has been at all relevant times, a shareholder of the Company. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

155.   Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

156.   A pre-suit demand on the Company's Board is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Kelly, Belldegrun, Dekkers, Henry, Sankar, Shetty, and Sloan (the "Director-Defendants"), and non-party Reshma Kewalramani (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of eight Directors who are on the Board at the time this action is commenced.

157.   Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage and/or cause the Company to engage in the Misclassification Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

158.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in the foregoing schemes. The fraudulent schemes were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

159.   Additional reasons that demand on Defendant Kelly is futile follow. Defendant Kelly cofounded Legacy Ginkgo in 2008 with Defendant Shetty and others. He served as CEO and as a director of Legacy Ginkgo from 2008 until the Merger, from which point he has continued serving in those roles

at the Company. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Kelly with his principal occupation for which he receives handsome compensation. In addition, he is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. Moreover, as of March 17, 2022, Defendant Kelly beneficially owned 21.1% of the Company's Class B common stock, or 16.5% of the Company's total voting power, which together with his positions at the Company makes him a controlling shareholder. As CEO, Defendant Kelly was ultimately responsible for all of the false and misleading statements and omissions that were made by Legacy Ginkgo prior to the Merger and all of the false and misleading statements made by New Ginkgo following the Merger. As the highest officer of Ginkgo and as a trusted director of the Company, he conducted little, if any, oversight of the schemes to cause Ginkgo to engage in the Misclassification Conduct and to cause the Company to make false and misleading statements. Furthermore, Defendant Kelly consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Likewise, he aided and abetted the SRNG Defendants' breaches of fiduciary duty, including their engagement in the Overpayment Misconduct, prior to the Merger. Defendant Kelly is also a defendant in the Securities Class Action, where he faces a substantial likelihood of liability. For these reasons, Defendant Kelly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160. Additional reasons that demand on Defendant Shetty is futile follow. Defendant Shetty cofounded Legacy Ginkgo in 2008 with Defendant Kelly and others. She served as COO, President, and as a director of Legacy Ginkgo from 2008 until the Merger, from which point she has continued serving in those roles at New Ginkgo. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Shetty with her principal occupation for which she receives handsome compensation. In addition, she is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. Moreover, as of March 17, 2022, Defendant Shetty beneficially owned 42.4% of the Company's Class B common stock, or 33.2% of the Company's total voting power, which together with

her positions at the Company makes her a controlling shareholder. As COO and President of Ginkgo and as a trusted Company director, she conducted little, if any, oversight of the schemes to cause Ginkgo to engage in the Misclassification Conduct and to cause the Company to make false and misleading statements. In addition, she consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Shetty aided and abetted the SRNG Defendants' breaches of fiduciary duty, including their engagement in the Overpayment Misconduct, prior to the Merger. For these reasons, Defendant Shetty breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

161.   Additional reasons that demand on Defendant Belldegrun is futile follow. Defendant Belldegrun has served as a Company director since the Merger, and he currently serves as a member of the Compensation Committee. As a Company director, he receives significant compensation from the Company. In addition, he is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. Prior to joining the Company's Board, he assisted in the due diligence in preparation for the Merger. Specifically, the Proxy Statement describes Defendant Belldegrun as having a "partnership" with Defendant Kazam, and Defendant Belldegrun attended meetings involving representatives from Legacy Ginkgo and SRNG. Furthermore, he toured Legacy Ginkgo's Foundry in Boston to meet, among others, Defendant Kelly. Following his investigation, he advised Defendant Sloan and the SRNG Defendants on Legacy Ginkgo's potential. Thus, he played a crucial role in effecting the Merger, including aiding and abetting the SRNG Defendants' engagement in the Overpayment Misconduct. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause Ginkgo to engage in the Misclassification Conduct and to cause the Company to make false and misleading statements. Likewise, he consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Belldegrun breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

162.    Additional reasons that demand on Defendant Dekkers is futile follow. Defendant Dekkers served as chairman of the board of directors of Legacy Ginkgo from April 2019 until the Merger, when became the Chairperson of the Company's Board. In addition, he serves as Chair of the Nominating and Corporate Governance Committee. The Company admits that Defendant Dekkers is non-independent. As a Company director, he receives significant compensation from the Company. In addition, he is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. As a trusted director of Legacy Ginkgo and then of New Ginkgo, he conducted little, if any, oversight of the schemes to cause Ginkgo to engage in the Misclassification Conduct and to cause the Company to make false and misleading statements. Moreover, he consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Dekkers aided and abetted the SRNG Defendants' breaches of fiduciary duty, including their engagement in the Overpayment Misconduct, prior to the Merger. For these reasons, Defendant Dekkers breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

163.    Additional reasons that demand on Defendant Henry is futile follow. Defendant Henry served as a director of Legacy Ginkgo from November 2016 until the Merger, when he became a member of the Company's Board. He currently serves as Chair of the Audit Committee and as a member of the Compensation Committee. As a Company director, he receives significant compensation from the Company. In addition, he is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. As a trusted director of Legacy Ginkgo and then of New Ginkgo, he conducted little, if any, oversight of the schemes to cause Ginkgo to engage in the Misclassification Conduct and to cause the Company to make false and misleading statements. Moreover, he consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Henry aided and abetted the SRNG Defendants' breaches of fiduciary duty, including their engagement in the Overpayment Misconduct, prior to the

Merger. For these reasons, Defendant Henry breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

164.    Additional reasons that demand on Defendant Sankar is futile follow. Defendant Sankar served as a director of Legacy Ginkgo from December 2015 until the Merger, when he became a member of the Company's Board. He currently serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Corporate Governance Committee. As a Company director, he receives significant compensation from the Company. In addition, he is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. As a trusted director of Legacy Ginkgo and then New Ginkgo, he conducted little, if any, oversight of the schemes to cause Ginkgo to engage in the Misclassification Conduct and to cause the Company to make false and misleading statements. Moreover, he consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sankar aided and abetted the SRNG Defendants' breaches of fiduciary duty, including their engagement in the Overpayment Misconduct, prior to the Merger. For these reasons, Defendant Sankar breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

165.    Additional reasons that demand on Defendant Sloan is futile follow. Defendant Sloan served as CEO and Chairman of SRNG from October 2020 until the Merger, after which he has served as a member of the Company's Board. He currently serves as a member of the Audit Committee. In addition, he is one of three managing members of Sponsor, which beneficially owned 48.9 million shares of the Company's Class A common stock as of November 8, 2021. Thus, he personally had a large financial interest in effecting the Merger before the two-year time limit ran and he missed out on a personal windfall. As a Company director, he receives significant compensation from the Company. In addition, he is eligible to receive compensation paid under the 2021 Plan that was approved in part due to the false and misleading statements for which certain of the Individual Defendants are responsible. Defendant Sloan has orchestrated at least eight highly lucrative SPAC merger deals—including the Merger—a number of

which have involved certain of the SRNG Defendants, including and especially Defendant Baker. Any revelation that the Merger was tainted by misconduct would negatively affect Defendant Sloan's ability to execute additional such transactions in the future, disrupting a business strategy that has proved to be enormously profitable to him personally and to his close business associates, some of whom are Individual Defendants here. As a trusted director of the Company throughout the Relevant Period, he conducted little, if any, oversight of the schemes to engage in the Overpayment Misconduct, to cause Ginkgo to engage in the Misclassification Conduct, and to cause the Company to make false and misleading statements. In addition, he consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Sloan is a defendant in the Securities Class Action, where he faces a substantial likelihood of liability. For these reasons, Defendant Sloan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

166.    Additional reasons that demand on the Board is futile follow.

167.    Defendants Kelly, Shetty, Dekkers, Henry, and Sankar all served as executives or directors of Legacy Ginkgo prior to the Merger, in which capacity they exercised control over Legacy Ginkgo, caused Legacy Ginkgo to agree to merge with SRNG, and stood to personally profit from the Merger. Additionally, Defendant Belldegrun served as an advisor to SRNG in its plan to effectuate the Merger. Thus, Defendants Kelly, Shetty, Belldegrun, Dekkers, Henry, and Sankar aided and abetted the SRNG Defendants' engagement in the Overpayment Misconduct and are unlikely to pursue action against one another or against Defendant Sloan, the former CEO of SRNG. Accordingly, the Director-Defendants face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

168.    The Director-Defendants have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Director-Defendant Sloan and Defendant Baker are both managing members of Sponsor, which played a crucial role in effecting the Merger. In addition, Director-Defendant Sloan is closely affiliated with the SRNG Defendants. For instance, he has previously

effected highly lucrative SPAC Mergers with Defendants Baker, Delman, Kazam, Miller, and Paul. Thus, Director-Defendant Sloan is unlikely to investigate his long-time business partners, with whom he has coordinated and executed highly lucrative SPAC merger transactions. Defendant Kelly and Defendant Shetty are two of Legacy Ginkgo's cofounders, and have worked together since 2008. Together, their holdings of the Company's securities amount to over half of the Company's voting power. Their holdings of Class B common stock as of March 17, 2022, if converted to Class A common stock, would have been worth approximately $737.3 million. Thus, the highly lucrative nature of Defendant Kelly's and Defendant Shetty's longstanding relationship makes it exceedingly unlikely either would investigate the other. Furthermore, Director-Defendants Kelly and Shetty have longstanding relationships with other Director-Defendants. Specifically, Director-Defendants Henry and Sankar joined the board of directors of Legacy Ginkgo in 2016 and 2015, respectively, and thus Director-Defendants Henry, Kelly, Sankar, and Shetty are unlikely to investigate one another due to their longstanding business relationships. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

169.    In violation of the Audit Committee Charter, the Audit Committee Defendants, consisting of Defendants Henry, Dekkers, and Sloan, conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Misclassification Misconduct, to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Audit Committee Defendants failed to review and discuss the Company's earnings press releases and failed to adequately oversee related person transactions, the integrity of the Company's financial statements, the Company's compliance with applicable laws and regulations, and the performance of the Company's internal audit function. In addition, the Audit Committee failed to adequately maintain internal controls, as evidenced by the misconduct alleged herein. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand

is excused as to them.

170.    Demand in this case is further excused because the Directors are beholden to and controlled by Defendants Kelly and Shetty, who are Ginkgo cofounders and who, as of March 17, 2022, together controlled more than 49.7% of the Company's voting power. In light of this control, the Directors cannot impartially consider a demand against Defendants Kelly and Shetty, who are interested, primary wrongdoers, as they are dependent on Defendants Kelly and Shetty for their continued employment with the Company and the lucrative compensation that goes with that. Thus, the Directors are unable to evaluate a demand with disinterest or independence as a result of Defendant Kelly's and Defendant Shetty's control over them.

171.    In violation of Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in the Misclassification Misconduct, to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest, protect Company assets, ensure the accuracy of financial reports and public communications, comply with applicable laws and regulations, and report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

172.    The Company has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages the Company suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

173.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As the

Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

174.     The acts complained of herein constitute violations of fiduciary duties owed by the Company's officers and directors, and these acts are incapable of ratification.

175.     The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to Company stockholders. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue the Director-Defendants or certain of the officers of the Company, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Board is futile and, therefore, excused.

176.     If there is no directors' and officers' liability insurance, then the Directors will not cause the Company to sue the Individual Defendants named herein, since, if they did, the Individual Defendants, who comprise nearly all of the Board, would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

177.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against the Defendants Sloan, Delman, Kazam, Lee, Leiweke, Miller, and Paul for
Violations of Section 14(a) of the Exchange Act**

178.     Plaintiff incorporates by reference and realleges each and every allegation set forth above,

as though fully set forth herein.

179.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

180.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

181.    Under the direction and watch of the Defendants Sloan, Delman, Kazam, Lee, Leiweke, Miller, and Paul, the Proxy Statement failed to disclose, *inter alia*: (1) the SRNG Defendants had failed to exercise risk oversight functions at SRNG and were causing or permitting SRNG to issue false and misleading statements, and thus the SRNG Defendants were breaching their fiduciary duties; (2) the post-Merger Company's Board and Audit Committee would not adequately exercise these functions and would cause or permit the Company to continue issuing false and misleading statements; and (3) Defendant Sloan, who was on the SRNG Board and who continued serving as a director following the Merger, was improperly interested in receiving unjust compensation by seeking shareholder approval of the 2021 Plan.

182.    The Proxy Statement further failed to disclose that: (1) Ginkgo was engaging in the Misclassification Misconduct; (2) Ginkgo's failure to derive revenue from third parties left it almost fully dependent on related parties; (3) most or all of Ginkgo's revenue came from related parties that it created, funded, or controlled; (4) many of Ginkgo's new partners were undisclosed related parties; (5) as a result of the foregoing, the valuation of Ginkgo had been misrepresented to investors; and (6) the Company failed to maintain adequate internal controls.

183.    Furthermore, the Proxy Statement was materially false and misleading because it failed to

disclose that the Merger solicited in the Proxy Statement was agreed to on terms that were unfavorable to SRNG shareholders in light of the Misclassification Misconduct. Thus, by failing to disclose that the SRNG Defendants were engaged in a scheme to engage in the Overpayment Misconduct, the Proxy Statement was materially misleading.

184.    In the exercise of reasonable care, Defendants Sloan, Delman, Kazam, Lee, Leiweke, Miller, and Paul should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Company shareholders in voting on the matters set forth for shareholder determination in the Proxy Statement, including but not limited to, the approval of the Merger, the election of Defendants Kelly, Shetty, Belldegrun, Dekkers, Henry, Sankar, and Sloan, and the approval of the 2021 Plan.

185.    The false and misleading elements of the Proxy Statement led SRNG shareholders to, among other things: (1) approved numerous proposals necessary to effectuate the Merger, the terms of which were unfavorable to SRNG shareholders, who were unknowingly sanctioning the Overpayment Misconduct; (2) reelected Defendant Sloan to the Company's Board, allowing him to continue breaching his fiduciary duties to the Company; (3) elected Defendants Kelly, Shetty, Belldegrun, Dekkers, Henry, and Sankar to the Board, who aided and abetted the SRNG Defendants' breaches of fiduciary duty and who breached their fiduciary duties to New Ginkgo; and (4) approved the 2021 Plan, under which the New Ginkgo Defendants became eligible to receive compensation that was unjust under the circumstances.

186.    The Company was damaged as a result of the Defendants Sloan's, Delman's, Kazam's, Lee's, Leiweke's, Miller's, and Paul's material misrepresentations and omissions in the Proxy Statement.

187.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

188.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

189.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of the Company's business and affairs.

190.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

191.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the Company's rights and interests.

192.    In breach of their fiduciary duties owed to the Company, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Ginkgo was engaging in the Misclassification Misconduct; (2) Ginkgo's failure to derive revenue from third parties left it almost fully dependent on related parties; (3) most or all of Ginkgo's revenue came from related parties that it created, funded, or controlled; (4) many of Ginkgo's new partners were undisclosed related parties; (5) as a result of the foregoing, the valuation of Ginkgo had been misrepresented to investors; and (6) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

193.    The Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

194.    The SRNG Defendants breached their fiduciary duties to the Company by causing SRNG to engage in the Overpayment Misconduct by acquiring Legacy Ginkgo on terms that were unfair to SRNG shareholders in light of the misconduct described herein, which was then undisclosed.

195.    The New Ginkgo Defendants breached their fiduciary duties by causing the Company to engage in the Misclassification Misconduct.

196.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain adequate internal controls.

197.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

198.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, the Company has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.     Plaintiff on behalf of the Company has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Unjust Enrichment**

201.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

202.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

203.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes any compensation

received under the 2021 Plan, which certain Individual Defendants induced the Company's shareholders to approve through false and misleading representations.

204.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

205.    Plaintiff on behalf of the Company has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Abuse of Control

206.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

208.    As a direct and proximate result of the Individual Defendants' abuse of control, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209.    Plaintiff on behalf of the Company has no adequate remedy at law.

## FIFTH CLAIM

### Against the Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

211.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly-held corporation.

212.    As a direct and proximate result of the Individual Defendants' gross mismanagement and

breaches of duty alleged herein, the Company has sustained and will continue to sustain significant damages.

213.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff on behalf of the Company has no adequate remedy at law.

## SIXTH CLAIM

### Against the Individual Defendants for Waste of Corporate Assets

215.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

217.    In addition, the SRNG Defendants caused the Company to engage in the Overpayment Misconduct, further wasting the Company's assets.

218.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused the Company to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

219.    As a result of the waste of corporate assets, the Individual Defendants and are each liable to the Company.

220.    Plaintiff on behalf of the Company has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Kelly, Dmytruk, and Sloan for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

221.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

222.    The Company, Defendant Kelly, Defendant Dmytruk, and Defendant Sloan are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for

violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kelly's, Dmytruk's, and Sloan's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or director of the Company.

223.    Defendants Kelly, Dmytruk, and Sloan, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

224.    Accordingly, Defendants Kelly, Dmytruk, and Sloan are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

225.    As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Kelly, Dmytruk, and Sloan.

## EIGHTH CLAIM
### Against the Legacy Ginkgo Defendants and Defendant Belldegrun
### for Aiding and Abetting Breach of Fiduciary Duty

226.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

227.    The Legacy Ginkgo Defendants and Defendant Belldegrun aided and abetted the SRNG Defendants who breached their fiduciary duties to the Company.

228.    The misconduct of the Legacy Ginkgo Defendants and Defendant Belldegrun resulted in continuous, connected, and ongoing harm to the Company.

229.    Specifically, the Legacy Ginkgo Defendants promoted the Merger by issuing false and misleading statements concerning Ginkgo's products, operations, and business prospects, including with respect to its foundry revenue. Moreover, the Legacy Ginkgo Defendants controlled and operated Legacy Ginkgo, the Company's operational predecessor, and caused Legacy Ginkgo to issue press releases which contained materially false and misleading statements promoting the Ginkgo's and therefore the

Company's future operations and prospects.

230.    The Legacy Ginkgo Defendants caused Legacy Ginkgo to engage in the Misclassification Misconduct during the Relevant Period, and they failed to disclose such misconduct during the Relevant Period. In so doing, they aided and abetted the SRNG Defendants' engagement in the Overpayment Misconduct.

231.    Defendant Belldegrun served as an advisor to the SRNG Defendants in negotiations, investigation, and due diligence into Legacy Ginkgo prior to the consummation of the Merger. He had a "partnership" with Defendant Kazam, attended a number of meetings with Legacy Ginkgo and the SRNG Defendants, and inspected Legacy Ginkgo's headquarters and Foundry in Boston. He discussed Legacy Ginkgo's potential with, among others, Defendant Sloan. Thus, Defendant Belldegrun directly aided and abetted the SRNG Defendants engagement' in the Overpayment Misconduct.

232.    The Legacy Ginkgo Defendants and Defendant Belldegrun are jointly and severally liable to the same extent as the SRNG Defendants are liable for the SRNG Defendants' breaches of fiduciary duty as set forth herein or violations of any other laws.

233.    As a direct and proximate result of the aiding and abetting by Defendant Belldegrun and the Legacy Ginkgo Defendants of the SRNG Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

234.    Plaintiff on behalf of the Company has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of the Company, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to the Company;

(c)    Determining and awarding to the Company the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together

with pre-judgment and post-judgment interest thereon;

(d)     Directing the Company and the Individual Defendants to take all necessary actions to reform and improve the Company's corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the Company's shareholders to nominate at least four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding the Company restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: March 31, 2022                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/* Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, California 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

61

## **VERIFICATION**

I, Naresh Suri am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __th day of __3/30/2022__, 2022.

_DocuSigned by:_
_Naresh Suri_
_FAB3F7956AF0419..._

Naresh Suri